# In the United States Court of Federal Claims
No. 16-1001C
(Filed: March 29, 2017)

| | |
|---|---|
| SENECA SAWMILL COMPANY, an Oregon Corporation, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Motion to Dismiss for Failure to State a Claim; RCFC 12(b)(6); Timber Sale Contract; Plausible Allegation of Entitlement to Relief. |

*Michael E. Haglund*, Haglund Kelley LLP, Portland, OR, for Plaintiff. *Julie A. Weis* and *Sara Ghafouri*, Haglund Kelley LLP, Portland, OR, Of Counsel.

*Daniel B. Volk*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Scott D. Austin*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General.

**OPINION AND ORDER**

**KAPLAN, Judge.**

This breach-of-contract case is before the Court on the government's motion to dismiss under Rule 12(b)(6) of the Rules of the Court of Federal Claims (RCFC). Plaintiff Seneca Sawmill Company (Seneca) alleges that the United States Forest Service (USFS) breached a timber sale contract Seneca has held since 2003 by reducing the harvestable acreage under the contract from 149 acres to 33 acres.

As discussed in more detail below, Seneca has plausibly alleged that USFS breached the contract by failing to comply with the contract's provisions and its duties under the contract. Accordingly, the government's motion to dismiss is **DENIED**.

# BACKGROUND[1]

## I.  The Contract

In October 2003, USFS auctioned 149 acres of timber in the Willamette National Forest for harvest as part of a timber sale known as the Trapper Timber Sale. See Compl. ¶¶ 6–7, ECF No. 1; Def.'s Mot. to Dismiss (Def.'s Mot.) App. at A19, ECF No. 6-1. Seneca submitted the highest bid and was awarded a contract to harvest the timber. Compl. ¶¶ 6–7.

The Trapper Timber Sale was part of a forest management project called the Trapper Project. See Def.'s Mot. App. at A20. The Trapper Project aimed to replicate the tree-removal effects of different types of forest fires through selective logging. Id. at A2. In accordance with federal law, USFS conducted an environmental assessment before beginning the Trapper Project. See id. at A20. As part of the assessment, the Forest Service requested an opinion from the U.S. Fish and Wildlife Service (FWS) regarding the project's likely impact on the northern spotted owl, an endangered species. Id. In consultation with FWS, USFS concluded that the Trapper Project was "likely to adversely affect" (LAA) the northern spotted owl. Id. At the same time, FWS produced a biological opinion stating that the Trapper Project was not likely to jeopardize the continued existence of the northern spotted owl as a species. Id.

When USFS subsequently completed the Trapper Project environmental assessment, however, it made a clerical error: instead of reporting that the project was likely to adversely affect the northern spotted owl, USFS stated that the project was "not likely to adversely affect" (NLAA) the owl. Id. (emphasis added). USFS then repeated the error in a May 12, 2003 decision notice giving the go-ahead to proceed with the Trapper Timber Sale. Id. Thus, when Seneca obtained the contract, it was unaware of the determination that the project was likely to adversely affect the northern spotted owl. See Compl. ¶ 11; Def.'s Mot. App. at A3–4.

The contract contained several provisions regarding the government's right to suspend and/or terminate logging operations. First, provision BT6.02 permitted the contracting officer (CO) to order Seneca to "interrupt or delay operations" to, among other things, "comply with a court order, issued by a court of competent jurisdiction." Def.'s Mot. App. at A63. Further, under provision CT8.24, the contract empowered the Chief of the Forest Service (Chief) to terminate the contract, in whole or in part, for a variety of reasons. Id. at A143. Thus, under provision CT8.24(a), the Chief could terminate the contract "[t]o comply with a court order . . . upon [a] determination that the

---

[1] The facts set forth below are based on the allegations in Seneca's complaint, which the Court accepts as true for purposes of deciding the government's motion to dismiss, as well as on the underlying contract, Seneca's claim before the contracting officer, and the contracting officer's decision, which are "integral to" Seneca's complaint. See AstraZeneca Pharm. LP v. Apotex Corp., 669 F.3d 1370, 1378 n.5 (Fed. Cir. 2012) (quotation omitted).

order would be applicable to the conditions existing on this timber sale." Id. Further, under Provision CT8.24(b)(v), the Chief could terminate the contract "[u]pon a determination by the Chief that the continuation of all or part of th[e] contract would . . . [a]dversely affect species listed as threatened or endangered under the Endangered Species Act." Id.

## II.   The Alleged Breach

Following the award, Seneca constructed roads and completed some preliminary engineering work. Compl. ¶ 8. But the Trapper Project soon became entangled in litigation over FWS's determination that the project was not likely to jeopardize the continued existence of the northern spotted owl as a species. See Def.'s Mot. App. at A20–21. Between 2004 and 2010, the government occasionally informed Seneca that logging operations could not proceed due to developments in that litigation. See id. at A21–22 (noting that operations were suspended at USFS's request between March 3, 2005 and August 16, 2005, and again between June 28, 2007 and September 7, 2007). During this period, Seneca also requested numerous market-related contract term additions to extend the contract termination date. See id. Seneca apparently did not conduct any logging during the periods when logging operations were not suspended. See id.

According to Seneca, it was prepared to begin logging in August 2010. Compl. ¶ 9. On July 29, 2010, however, a pair of northern spotted owls was discovered in or near portions of the timber covered by the contract. Id.; see also Def.'s Mot. App. at A23. USFS then suspended logging operations so that it could again consult with FWS. Def.'s Mot. App. at A23. Several environmental groups subsequently filed an action in the U.S. District Court for the District of Oregon seeking to enjoin USFS from proceeding with the project. Compl. ¶ 10; Def.'s Mot. App. at A23–24; see also Cascadia Wildlands v. U.S. Forest Serv., 791 F. Supp. 2d 979 (D. Or. 2011).

In the course of that litigation, the government acknowledged that it had mistakenly deemed the Trapper Project as NLAA with regards to the northern spotted owl rather than as LAA. See Def.'s Mot. App. at A3–4; see also Cascadia Wildlands, 791 F. Supp. 2d at 985. Further, discovery in that case turned up a letter or memorandum written by a Forest Service scientist in which the scientist opined that, because of changed conditions, logging under the contract likely would no longer provide the anticipated scientific benefits. See Def.'s Mot. App. at A4; see also Cascadia Wildlands, 791 F. Supp. 2d at 984–85; Pl.'s Unopposed Mot. to Suppl. the App. Ex. A, ECF No. 9-1. The district court then enjoined operations under the contract and ordered the government to prepare a supplemental environmental assessment and supplemental decision notice addressing the new information that had come to light. Def.'s Mot. App. at A23–24; see also Cascadia Wildlands, 791 F. Supp. 2d at 994.

Instead of preparing a supplemental environmental assessment, however, the government allegedly conducted an entirely new environmental assessment. Compl. ¶ 12. According to Seneca, in a November 4, 2013 meeting, the Forest Service informed Seneca that it was going to reduce the harvestable acreage under the contract to just

3

thirty-six acres. Id. ¶ 13. USFS then completed the new environmental assessment in May 2014, and issued a new decision notice on July 12, 2014. Def.'s Mot. App. at A25. The new decision notice allegedly permitted Seneca to harvest only thirty-three acres of timber. Compl. ¶ 13. Shortly thereafter, the District Court dissolved the injunction. Id.

On September 30, 2014, the regional forester responsible for the contract asked the Chief of the Forest Service to partially terminate the contract and reduce the acreage available for harvest in accordance with the new environmental assessment and decision notice. See id. ¶ 14; Def.'s Mot. App. at A25. The Chief, however, denied the request and directed the regional forester to instead work out a settlement with Seneca. Compl. ¶ 14; Def.'s Mot. App. at A26. Seneca then met with USFS on January 21, 2015, but the parties did not reach an agreement. Def.'s Mot. App. at A26; see also Compl. ¶ 14.

**III.     Seneca's Breach of Contract Claim Before the CO and the Government's Partial Termination of the Contract**

On August 18, 2015, Seneca submitted a certified claim to the CO alleging that USFS had breached the contract. Compl. ¶ 18; Def.'s Mot. App. at A13–14. It sought $4,440,439 in damages, including $4,123,626 in net lost profits. Compl. ¶ 18; Def.'s Mot. App. at A13. Seneca contended that the breach occurred "between November 2013 and March 2014," when USFS allegedly decided to reduce the harvestable acreage to less than forty acres and advised Seneca of the same. See Def.'s Mot. App. at A7–8. According to Seneca, however, the breach was caused by "the Government's negligence or willful misconduct dating back to 2003," which Seneca claimed "resulted in the permanent loss of the sale to Seneca, even though the Material Breach did not ultimately occur until 2013-2014." Id. at A8.

The CO denied Seneca's claim on May 9, 2016. Id. at A19. He concluded that the Forest Service's actions, including the acreage reduction, were "consistent with the contract" because the contract "anticipated and authorized suspensions to perform court-ordered environmental analysis." Id. at A31 (citing provision B6.02(a)(ii)). The CO also noted that Seneca "had most or all of five operating seasons to log the sale" between 2003 and 2010, but had conducted "[n]o operations other than road construction . . . during those operating seasons." Id. Despite denying Seneca's claim, the CO determined that USFS would owe Seneca $141,327.98 for "the value of the road reconstruction and DRES" upon a partial termination of the contract. Id. at A33.

The Chief issued such a termination on May 9, 2016 (the same day as the CO's decision). Id. at A35. Noting his authority under 36 C.F.R. § 223.116(b) and provision CT8.24(a), the Chief stated that the termination was "the result of changes that [USFS] made to the Trapper Project following the district court's order enjoining the timber sale." Id. (quotation omitted). The Chief noted that after the termination, "[a] total of 27 acres remain in the sale." Id.

4

**IV. This Action**

Seneca filed this action on August 12, 2016. See Compl. It alleges that USFS breached the contract "in November 2013 when [it] advised [Seneca] that the timber sale contract would not proceed as originally awarded and that the harvest area would be reduced to 36 acres." Id. ¶ 17. It seeks $4,440,369 in damages, including $4,123,626 in lost profits. Id. ¶ 23.

On October 14, 2016, the government moved to dismiss Seneca's complaint under RCFC 12(b)(6) for failure to state a claim. ECF No. 6. Seneca filed an opposition on November 17, 2016, ECF No. 7, and the Court held oral argument on March 21, 2017.

**DISCUSSION**

**I. Jurisdiction**

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Subsection (a)(2) of section 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the Contract Disputes Act (CDA)—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued."

The CDA applies to claims based upon "any express or implied contract . . . made by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a). The law sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010). In particular, the contractor must submit a valid claim to the CO and receive the CO's final decision on that claim before bringing an action in federal court. See id. Contractors seeking more than $100,000 in damages must also certify, among other things, the accuracy and completeness of their claims. See 41 U.S.C. § 7103(b)(1); FAR 33.207(a), (c).

The CDA covers timber sale contracts with the government, see Scott Timber Co. v. United States, 333 F.3d 1358, 1365–66 (Fed. Cir. 2003), and the government does not dispute that Seneca submitted a valid, certified claim to the CO. Accordingly, the Court has jurisdiction over this case.

**II. Merits**

When considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the court accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678

5

(2009). The court also draws all reasonable inferences in favor of the non-moving party. Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). So construed, the plaintiff's allegations must "raise [the] right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The plaintiff therefore must supply more than conclusory allegations or a bare recitation of the elements of a cause of action; but it is not required to provide the court with "detailed factual allegations." Id.; see also Iqbal, 556 U.S. at 677–78.

Accepting Seneca's factual allegations as true and drawing inferences in its favor, the Court concludes that Seneca has plausibly alleged an entitlement to relief on its breach-of-contract claims. At its core, the complaint alleges that by November 2013, the government had decided to reduce the harvestable acreage under the contract to less than forty acres; that this decision was not made in compliance with the contract's termination provision; and that the decision flowed from the government's negligence and misfeasance, which hindered Seneca's execution of the contract and resulted in the district court's injunction. See Compl. ¶¶ 11, 13, 17; see also Pl.'s Opp'n to Def.'s Mot. to Dismiss at 9–12. Accepted as true, these allegations suffice to allow the Court to infer that the government breached the termination provision and its duty not to unreasonably hinder Seneca's performance of the contract.

Critically, while the allegations center on the decisions USFS purportedly made between 2003 and 2014 with respect to Seneca's contract and the reasons it made those decisions, the documents that comprise and explain those decisions (other than the CO's decision denying Seneca's administrative claim) are not currently before the Court. Nor would it be appropriate for the Court to examine them at this stage of the litigation. See A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (observing that when deciding a motion to dismiss for failure to state a claim, the court looks to the allegations in the complaint and "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record" (alteration in original) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004))). The Court thus concludes that factual development regarding those decisions is necessary for it to resolve Seneca's claims.

The government's arguments to the contrary lack merit. It primarily contends that Seneca has failed to plausibly allege that USFS breached any "obligation or duty arising out of the parties' contract" because the contract included provisions allowing USFS to suspend and/or terminate the contract to comply with a court order. Def.'s Mot. at 4–5.[2] But the thrust of Seneca's complaint is that USFS did not follow those provisions. Rather,

---

[2] In its reply brief, the government appears to expand this argument by stating that the contract "authorized the Forest Service to terminate the contract, in whole or in part, to comply with court orders or avoid environmental harm." Def.'s Reply in Supp. of Its Mot. to Dismiss (Def.'s Reply) at 6, ECF No. 8. Although this accurately describes the contract's terms, it provides no basis to dismiss the complaint. Further development of the record is required to determine whether USFS terminated the contract pursuant to its authority to do so to avoid environmental harm.

according to Seneca, the decisions that led to the termination were not necessary to comply with a court order or otherwise were not made in accordance with the termination provision. See Wetsel-Oviatt Lumber Co. v. United States, 38 Fed. Cl. 563, 569–70 (1997) (observing that the government may not "tak[e] refuge behind procedures required for modification and termination of [a] contract" unless those procedures have been followed). As noted, the record needed to establish the basis for USFS's decisions remains to be developed. The Court cannot evaluate USFS's compliance with the contract's termination provision in the context of the motion to dismiss.

In its reply brief, the government also claims that the new information cited by the district court when it issued its injunction does not support Seneca's breach of contract claim. See Def.'s Reply at 3–5 (arguing that the NLAA error predated the contract and that there was nothing "inappropriate" about the scientist's letter because it "was the product of the passage of time and changed circumstances"). These contentions are not persuasive. First, although it is true that pre-contract conduct cannot support a claim that the government breached a duty in the performance of the contract, see Scott Timber Co. v. United States, 692 F.3d 1365, 1372 (Fed. Cir. 2012), Seneca has not made such a claim. Rather, it has alleged that the government breached the duty not to hinder its performance through the actions it took (or failed to take) after it discovered or should have known about the error.

Second, the government's characterization of the scientist's letter amounts to a request that the Court draw an inference in its favor about the letter's propriety and legal effect. At this stage of the litigation, however, the party entitled to have inferences drawn in its favor is Seneca, not the government. This argument is thus entitled to no weight.

At bottom, Seneca's breach of contract claim turns on specific facts about USFS's acts and decisions, and evidence regarding those acts and decisions is not currently before the Court. And because Seneca's allegations, taken as true, set forth a plausible claim that it is entitled to relief, the Court has no basis for dismissing Seneca's complaint.

## CONCLUSION

For the reasons discussed above, the government's motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan<br>
ELAINE D. KAPLAN<br>
Judge