# In the United States Court of Federal Claims

No. 16-1001C

(Filed: July 2, 2020)

| | | |
|---|---|---|
| SENECA SAWMILL COMPANY, | ) | Keywords: Motion for Summary |
| | ) | Judgment; Breach of Contract; |
| | ) | Environmental Assessment; Supplemental |
| Plaintiff, | ) | Environmental Assessment; Timber |
| | ) | Sale Contract; Res Judicata; Termination |
| v. | ) | Provision; Mitigation of Damages; |
| | ) | Compliance with Injunction. |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

*Michael E. Haglund* and *Julie E. Weis*, Haglund Kelley LLP, Portland, OR, for Plaintiff.

*Daniel B. Volk*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Elizabeth M. Hosford*, Assistant Director, *Robert E. Kirschman, Jr.,* Director, and *Joseph H. Hunt*, Assistant Attorney General. *Benjamin Hartman*, Office of the General Counsel, United States Department of Agriculture, Portland, OR, Of Counsel, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff, the Seneca Sawmill Company ("Seneca"), brings this action seeking damages for breach of a timber sale contract it entered with the United States Forest Service. The timber sales were to be undertaken in connection with the Trapper Project, a landscape management effort in the Willamette National Forest in Oregon. The project was authorized following a 2003 environmental assessment ("2003 EA") which found it would have no significant environmental impact.

The alleged breach of the timber sale contract occurred in the wake of a successful suit environmental groups brought in 2010 alleging that—given new information and changed circumstances—the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., required the 2003 environmental assessment to be revisited. See Cascadia Wildlands v. U.S. Forest Serv., 791 F. Supp. 2d 979 (D. Or. 2011). The district court ordered the timber sale enjoined pending the preparation of a supplemental environmental assessment ("EA") and Decision Notice that addressed two issues: 1) the effect of the harvesting of timber on the

northern spotted owl and its habitat, and 2) whether new information called into question the continued learning value of the project.

In response to the injunction, the Forest Service conducted new environmental surveys and prepared a revised EA and Decision Notice. The revised assessment addressed not only the issues that had been the subject of the district court's order; it also identified additional obstacles to the timber harvest arising out of, among other things, the presence of red tree vole nests. Based on the results of that revised assessment, the Forest Service removed all but twenty-seven of the approximately 150 harvestable acres that were the subject of the contract and invoked its authority under the contract to partially terminate it to comply with a court order.

Seneca alleges that the Forest Service breached the timber sale contract when it issued a new EA rather than a supplemental one limited to the issues identified in the court order. According to Seneca, the Forest Service's actions were not justified by the contractual provision authorizing terminations to comply with a court order. In addition, it argues, the Forest Service violated the duty of good faith and fair dealing implied in the contract by not limiting its response to the court order to the specific deficiencies the district court identified.

The government has moved for summary judgment. It argues that because Seneca was an intervenor in Cascadia Wildlands, res judicata precludes it from arguing that the Forest Service went further than necessary to comply with the district court's order. Second, the government contends that Seneca's interpretation of the contract's termination provision is erroneous. It argues that Seneca's good faith and fair dealing claim—which posits that the Forest Service had an obligation to attempt to minimize injury to Seneca in responding to the district court order—is without merit as a matter of law. The government further argues Seneca's breach claim has been waived because it actually performed under the modified contract. Finally, in the event that the Court does not grant summary judgment as to liability, the government moves for summary judgment regarding a proof of damages issue.

For the reasons that follow, the government's motion for summary judgment is denied-in-part and granted-in-part.

## BACKGROUND

### I.     The Origins of the Trapper Project[1]

As noted above, the Forest Service entered the timber sale contract at issue in this case as part of its implementation of the Trapper Project. That Project was a product of the Blue River Landscape Strategy ("BRLS") which the Forest Service initiated in 1998 pursuant to the

---

[1] The Court's opinion on the government's motion to dismiss in this case contains a more thorough recitation of the facts surrounding the formation of the contract. See Seneca Sawmill Co. v. United States, 130 Fed. Cl. 774 (2017). The facts in this section are based on the appendices to the government's motion for summary judgment and the plaintiff's response. Unless specifically noted, the facts set forth are not in dispute.

Northwest Forest Plan ("NWFP") for the Central Cascades Adaptive Management Area. Def.'s Summ. J. App. ("Def.'s App.") at 8–9, 15, 1005, ECF Nos. 48, 48-5. The Strategy involved experimental timber harvesting and other measures intended to replicate the results of wildfires for study by the Forest Service. Id. at 9. The Project involved, among other things, "using timber harvesting techniques, prescribed fire and snag creation methods to approximate stand structures resulting from historic high severity, stand-replacement fires and partial-stand replacement fires on 155 acres." Id. at 12.

In accordance with section 7 of the Endangered Species Act, the Forest Service formally consulted with the U.S. Fish and Wildlife Service ("FWS") concerning the Project. The FWS issued a Biological Opinion in September 1998 that found that the project was "not likely to jeopardize the continued existence of the spotted owl or result in the destruction or adverse modification of spotted owl critical habitat." Id. at 70.

In May of 2003, relying on this Opinion, among other things, the Forest Service issued an EA and a Decision Notice and Finding of No Significant Impact for the Trapper Project ("2003 FONSI"). Id. at 177–96. The district ranger concluded that the project was "not a major Federal action that would significantly (40 CFR 1508.27) affect the quality of the human environment (40 CFR 1508.14)." Id. at 194. Citing the FWS Opinion, the district ranger determined that the project "may effect, but [was] not likely to adversely affect" the northern spotted owl—a determination that served as partial justification for the Trapper Project without preparing an environmental impact statement. Id. at 192; see also id. at 194–95 (reporting under the heading "Finding of No Significant Impact" that "Biological Evaluations . . . for . . . Threatened . . . species . . . indicated that the proposed project will have no significant effects or adverse impacts to any species or their habitats").

## II.     The Timber Sale Contract

The Forest Service conducted an auction on October 14, 2003 and awarded the Trapper Timber Sale Contract No. 000533 to Seneca on October 23, 2003. Id. at 222. The contract granted Seneca the right to harvest timber, primarily from mature Douglas fir trees of 140 years in age, over an area approximately 149 or 155 acres in size. Id. at 162–72; 178.[2]

The contract contains a number of provisions that afford the Forest Service the right to suspend the contract or partially terminate it in the event that environmental issues arise during contract performance that affect its continued viability. The provision relevant to this case is CT8.24, entitled "Termination." Id. at 331, ECF No. 48-1. It states

---

[2] It is unclear from the record whether 149 or 155 acres were made available for harvest. Compare Def.'s App. at 178 (2003 Decision Notice) (stating that the Trapper Project encompasses 155 acres) with id. at 181 (2003 Decision Notice) (table identifying 149 total acres for "timber harvest, prescribed fire, and snag creation techniques to approximate the structures that resulted from historic stand-replacing and partial stand-replacing fires"). The existence of this ambiguity is immaterial to the issues before the Court on the government's motion.

in pertinent part that the Chief of the Forest Service may, by written notice, terminate the contract in whole or in part:

> (a) To comply with a court order, regardless of whether this timber sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this timber sale or
>
> (b) upon a determination by the Chief that the continuation of all or part of this contract would:
>
>> (i) Cause serious environmental degradation or resource damage;
>>
>> (ii) Be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;
>>
>> (iii) Cause serious damage to cultural resources pursuant to BT6.24;
>>
>> (iv) Cause serious damage to cave resources pursuant to BT6.26; or
>>
>> (v) Adversely affect species listed as threatened or endangered under the Endangered Species Act, 16 USC 1531, et seq., or a sensitive specifies identified by the Regional Forester pursuant to BT6.25.

Id. (hereinafter "provision CT8.24" or "CT8.24").

The contract also specifies the remedies available to Seneca where the Forest Service exercises its rights to terminate under CT8.24. As pertinent to this case, it states that "[c]ompensation for termination under paragraph (a) [to comply with a court order] shall be calculated pursuant to CT9.53." That section states in turn as follows:

CT9.53 — SETTLEMENT FOR ADMINISTRATIVE APPEAL (07/2001)

In the event of termination of this contract, in whole or in part, by the Chief as a result of an administrative appeal or litigation of the decision to sell timber included in this contract or pursuant to CT8.24, paragraph (a), Purchaser agrees that its sole and exclusive remedy shall be reimbursement for Out-of-Pocket Expenses, as defined by BT6.02. Purchaser agrees to provide receipts or other documentation to Contracting Officer that clearly identify and verify actual expenditures.

In the event of modification by Contracting Officer or partial termination, changes to the contract shall be limited to those determined by Contracting Officer to be necessary for correction of the deficiencies raised by the appeal or lawsuit. Changes to the contract shall be limited to requirements with which Purchaser can reasonably comply.

Id. at 335 (hereinafter "provision CT9.53" or "CT9.53").[3]

## III.   Intervening Developments

Although the contract was awarded in 2003, Seneca did not attempt to begin performance for some time thereafter. In addition, in accordance with CT9.110, Seneca's right to perform under the contract was suspended for brief periods of time between 2005 and 2007 because of litigation. See id. at 334, 1183, ECF No. 48-6.

In the meantime, opposition to the timber harvest grew in the community surrounding the Trapper area. See, e.g., id. at 484–85, ECF No. 48-2 (local newspaper article entitled "Delay revives logging debate" published August 24, 2010). In May of 2010, three scientists who had been involved with the Andrews Experimental Forest and with the BRLS submitted comments to the Willamette Forest Supervisor discussing community concerns ("Spies letter"). Id. at 470. They opined that the passage of time had revealed that the "value of the anticipated lessons from going forward with logging of the Trapper Timber Sale is very low relative to what was anticipated when the sale and associated monitoring plans were developed in the 1990s." Id. They observed that, in their view, "pushing forward with the Trapper Timber Sale may undercut efforts to undertake new discussions with the community about their future engagement with Willamette National Forest lands," and that "a positive atmosphere for those discussions has greater value than moving forward with a highly contentious timber sale." Id. Therefore, they stated, they were not opposed to dropping the sale. Id.

Two months later, in July of 2010, Seneca contacted the Forest Service to begin performance under the contract. See id. at 472. A pre-work meeting was held, after which the Forest Service conducted a review of "new information" concerning the presence of red tree voles and northern spotted owls in the Trapper Project area. Id.[4]

---

[3] CT8.24 also cross references CT9.51 and CT9.52, which specify the compensation due for termination under paragraph CT8.24(b). It states that compensation under CT8.24(b)(i) through (iv) is calculated pursuant to CT9.52, and that compensation for termination under paragraph (b)(v) is calculated pursuant to CT9.51. Def.'s App. at 331. Like the remedy for terminations to comply with a court order, the remedy for termination under (b)(v) (to protect endangered or sensitive species), set forth at CT9.51, consists only of out-of-pocket expenses. On the other hand, compensation for terminations pursuant to (b)(i) through (b)(iv) also includes "[t]he difference between current contract rates for the remaining uncut volume and the rates paid for comparable timber on the same National Forest during the preceding 6-month period multiplied by the remaining uncut volume." Id. at 334.

[4] The northern spotted owl is a threatened species under the Endangered Species Act, 50 C.F.R. § 17.11(h). See Def.'s App. at 68–70. Red tree voles are "survey and manage species" that are identified in the NWFP, id. at 1007, and are "an important food source for the threatened northern spotted owl," id. at 345.

In a review dated July 28, 2010, a Forest Wildlife Biologist noted that the presence of red tree vole nests had been reported within areas covered by the Trapper timber sale since the preparation of the 2003 FONSI. Id. However, he explained, under the 2001 Survey and Management standards and guidelines in effect at the time of the 2003 EA, the Forest Service was not obligated to conduct additional surveys for red tree voles and also was not required "to apply further management to [red tree voles] in units that have been sold." Id. at 473. At the same time, the Biologist noted, an additional pair of northern spotted owls had been found within the sale area and he recommended—in light of intervening litigation—that the Forest Service "consider" this information to "decide whether or not to reinitiate consultation" with the FWS. See id. at 478.

Soon thereafter, the Forest Service in fact did reinitiate consultation with the FWS regarding the effect of the Trapper timber sale on the northern spotted owl. Id. at 479. It suspended sale operations on July 29, 2010 in accordance with BT6.25 (entitled "site specific protection measures for threatened, endangered and sensitive species" (capitalization altered)). See id. at 307, 481. On August 30, it issued a "Biological Assessment for Reinitiation of Consultation for the Northern Spotted Owl." Id. at 488, ECF No. 48-3. The Assessment reported that "the removal of suitable habitat in the Trapper project may affect and is likely to adversely affect this northern spotted owl pair." Id. at 511. It also noted, however, that "[t]he activities of the proposed action comply with the Record of Decision and the Standards and Guidelines of the [NWFP] . . . and the Land and Resource Management Plan of the Willamette National Forest." Id. at 493.

Thereafter, a Forest Wildlife Biologist reviewed a December 10, 2010 "Reinitiation of the Biological Opinion regarding the Effects of the Trapper Timber Sale proposed by the Willamette National Forest on the Northern Spotted Owl"[5] to determine whether the Forest Service was legally required to conduct supplemental NEPA analysis.[6] Id. at 582. The Wildlife Biologist found that there were no substantial changes in the proposed action. Id. at 582–83. Nor did he find significant new circumstances relevant to the impact of the timber harvest on the northern spotted owl beyond what had already been considered in the original analysis of the Trapper sale that was reflected in the 2003 FONSI. Id. With respect to red tree voles, the Biologist agreed that the Trapper sale had met the requirements of the 2001 Survey and Manage Record of Decision and Standards and Guidelines and that no further action was required. Id. at 585.

Based on the review and formal consultation, the Willamette Forest Supervisor concluded "that no additional NEPA analysis is needed for the Trapper Timber harvest treatments" because the project remained unchanged, and because "the estimated effects to owls and red tree voles

---

[5] This document does not appear to be included in the record before the Court.

[6] This document explains that "NEPA requires an agency to prepare a supplemental NEPA analysis when '[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts.' 40 C.F.R. § 1502.9(c)(1)." Def.'s App. at 582.

based on the 2010 analysis are of the same magnitude as determined in the original project analysis." Id. at 585.

In December of 2010, the Forest Supervisor decided to remove approximately six acres from Seneca's harvestable acreage based on the December 10, 2010 FWS Biological Opinion. Id. at 586–87. The contract was modified accordingly. Id. at 587. Logging operations were otherwise allowed to continue. Id.

## IV.    The Cascadia Wildlands Litigation

In the meantime, in October of 2010, two environmental advocacy groups filed a complaint in the United States District Court for the District of Oregon alleging violations of NEPA and the Administrative Procedure Act ("APA"), and seeking to enjoin timber harvesting pursuant to the Trapper timber sale. Id. at 564. The plaintiffs claimed that the Forest Service violated NEPA "by failing to prepare a new or supplemental environmental analysis to address changed circumstances and new information relevant to the Trapper timber sale." Id. at 565; see 40 C.F.R. § 1502.9(c)(1)(ii) (requiring the supplementation of environmental assessments where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").[7] Specifically, according to the plaintiffs, the "new information" concerned the effect of timber harvesting on both the northern spotted owl and the red tree vole. Id. at 572–78. The government (along with Seneca, as intervenor) defended the Forest Service's determination that the new information upon which plaintiffs relied was not significant and therefore did not trigger an obligation for it to supplement its 2003 EA. Id. at 637, 683, 1132.

On May 24, 2011, the district court granted summary judgment to the plaintiffs. Cascadia Wildlands, 791 F. Supp. 2d at 994. It found that "new and significant information" had arisen showing that—contrary to the conclusions expressed in the 2003 FONSI—the Trapper timber sale was "likely to adversely affect" the northern spotted owl. Id. at 991, ECF No. 48-4. Therefore, the district court concluded, the Forest Service abused its discretion in "fail[ing] to prepare a supplemental EA (or [environmental impact statement])." Id.

The district court also considered the impact of the Spies letter on the Forest Service's obligations, focusing particularly on its statement that the "value of anticipated lessons" from the

---

[7] NEPA requires governmental agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." Def.'s App. at 984 (quoting 42 U.S.C. § 4332(2)(C)). If, as in this case, an agency decides based on an EA that the project does not have a significant impact on the environment, then it may issue a FONSI and it is not required to prepare an environmental impact statement. Cascadia Wildlands, 791 F. Supp. 2d at 983–84. As the district court explained, while the issuance of the FONSI "marks the completion of the NEPA process," additional action may be required if the agency makes substantial changes to the proposed action relevant to environmental concerns, or significant new information arises that will "affect the quality of the environment 'in a significant manner or to a significant extent not already considered.'" Id. at 983 (quoting March v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989)).

Trapper Project was "very low relative to what was anticipated when the sale and associated monitoring plans were developed in the 1990s." See id. at 991–94 (quoting the Spies letter, Def.'s App. at 470). The district court observed that the 2003 EA had "articulate[d] that [the] Trapper [Project was] designed as a learning/research project." Id. at 993. The Spies letter constituted "new information" that "call[ed] into question the learning value of the project" and that "should be evaluated as part of a supplemental EA." Id.

The district court issued an order enjoining the Trapper timber sale "pending the agency's preparation of a supplemental EA addressing the new information regarding the Northern Spotted owl and learning value of the project and a supplemental Decision Notice." Id. at 994.

## V.    Seneca is Notified of Suspension of Operations

On June 2, 2011, the contracting officer notified Seneca that logging operations under the Trapper timber sale were suspended. Def.'s App. at 744. A few weeks later, on June 20, the Willamette National Forest Supervisor and the contracting officer, among others, met with Seneca representatives to discuss the actions the Forest Service intended to take to "supplement the decision and EA (surveys, timeliness, analysis, likely outcomes)." Id. at 745.

In an email sent the day of the meeting, the Forest Supervisor recorded that Seneca expressed "surprise" at the Forest Service's position that "the Judge[']s decision meant that we'd need to bring the EA and corresponding decision up to today's standards." Id. "Based on their 'read' of the decision," the Supervisor observed, Seneca expected "a quick fix of the two things the Judge asked us to correct." Id. The Supervisor noted that he "went over the fact that the judge[']s decision requires a supplemental EA and new decision, and thus, this means updating the surveys and meeting today's NEPA analysis standards." Id. He told Seneca's representatives "that there was a high probability that additional surveys would result in changes to the sale." Id.

## VI.    Seneca's Motion for Clarification

On July 19, 2011, Seneca filed a motion for clarification with the district court. See id. at 748. In its motion, Seneca observed that, in its view, "the Forest Service [was] unclear as to the scope of analysis called for on remand." Id. It further observed that this lack of clarity might result in the Forest Service undertaking "a lengthy, costly analysis not focused on the deficiencies identified by the Court." Id. at 749. Seneca requested that the court clarify two points: 1) "that the Order does not require the Court-ordered supplemental EA to start from scratch on issues either not found deficient by the Court or not challenged by plaintiff"; and 2) "that the Order was not intended to predetermine the outcome of the supplemental NEPA process"; i.e., that the Court's reference to a "supplemental Decision Notice . . . should not be equated with a per se new decision as if Trapper were a new project." Id. "Clarification is warranted," argued Seneca, "because, prior to preparing the supplemental EA ordered by the Court, the Forest Service is not in a position to discern whether the Trapper Project should be modified such that a supplemental decision is warranted." Id.

The government "t[ook] no position" on Seneca's motion. Id. at 749. The plaintiffs, on the other hand, opposed it, arguing that the Forest Service had "no lack of clarity, given that both this court and the Ninth Circuit have addressed this exact situation at length and have provided

8

the Forest Service with ample guidance pertaining to its NEPA obligations on remand." Id. at 815.

On October 4, 2011, the district court largely denied Seneca's motion for clarification. Id. at 895–98 (district court order on motion for clarification). The court noted that the Forest Service, which would be responsible for preparing the supplemental EA and Decision Notice, had "not joined in Seneca's motion for clarification." Id. at 896. Therefore, granting Seneca's motion "would require [the court] to speculate about whether and what aspects of [the court's] order may need clarification" and it also "might be construed as limiting the broad discretion the Forest Service has in determining the scope of a supplemental EA." Id. at 896–97. Although the court agreed that its order "does not predetermine the results of the Forest Service's analysis," id. at 898, it stated that leaving its original Decision Notice unchanged "d[id] not appear to be a viable option" for the Forest Service because that would mean that the Forest Service would not have corrected its initial erroneous finding that the Trapper timber sale would have "no significant impact" on the northern spotted owl. Id. at 897 n.1.

## VII. The Revised Environmental Assessment and Dissolution of the District Court Injunction

On January 5, 2012, representatives from the Forest Service and Seneca met to discuss the wildlife surveys the agency intended to conduct in connection with its supplemental EA. Id. at 899. The contracting officer's meeting notes reflect that the Forest Service advised Seneca that:

> [D]ue to the amount of Red Tree Vole Nests and sensitive mollusks found throughout the sale area, and direction from the courts to redo the NEPA document and Decision Notice for the sale, th[e] sale would need to be modified to eliminate the acres where the Red Tree Vole and sensitive mollusks were found which would reduce the available volume to somewhere around two thirds.

Id.

On February 11, 2013, the Forest Service issued a notice to the public announcing its intent to prepare a revised EA for the Trapper Project and soliciting comments. Id. at 900. It quoted the district court's order directing that "the Trapper Timber sale is enjoined pending the agency's preparation of a supplemental EA addressing the new information regarding the Northern Spotted owl and learning value of the project and a supplemental Decision Notice." Id. The Forest Service explained that the "supplemental EA [would] address new information regarding the northern spotted owl [and] address the 'value of learning.'" Id. In addition, it stated that the EA would "bring the 2003 environmental analysis up to date with current policy and direction." Id.

The Forest Service issued a "Revised Trapper Project Environmental Assessment" in May of 2014 ("2014 EA"). Id. at 999. The 2014 EA explained that "[b]ecause 10 years have passed since the original environmental assessment, [the Forest Service was] completely revising [its] assessment and decision, rather than completing a supplement." Id. at 1006. It identified the "[s]pecific points of the court order" as

involving the new information regarding the northern spotted owl and the learning value of the project. Id. "The supplemental analysis," it stated, "will include discussion related to meeting the original intent of the 2003 Trapper Project EA purpose and need and updating the analysis and project to address current environmental standards and guidelines." Id.

Based on the information obtained in connection with the revised 2014 EA, the agency stated, it intended to reduce the available timber sale acres to thirty-three acres. Id. at 1111 (Decision Notice). It specified that approximately six of the acres to be removed from the sale were eliminated to protect northern spotted owl habitat. Id. at 998. The Forest Service removed other harvestable acreage to protect axetail slugs, which had been "identified as a new sensitive species" since 2003. Id. Additionally, the EA reflects that surveys for red tree voles had identified twenty-three active nests for which protective buffers were required under the NWFP's standards and guidelines for survey and manage species then in effect. Id. at 1007, 1037. In fact, the majority of the acreage to be removed from the sale (approximately 79.4 acres) was removed to carve out territory for these nests. Id. at 998.

On July 12, 2014, the Forest Service signed and issued a revised "Decision Notice and Finding of No Significant Impact." Id. at 1111–22. On July 30, 2014, the contracting officer notified Seneca of the new Decision Notice and that the Forest Service had "started the required fieldwork to implement . . . the decision." Id. at 1128. The contracting officer requested a meeting with Seneca to review the changes under the revised Decision Notice and discuss contract modification. Id.

On August 14, 2014, the plaintiffs and the government filed a stipulated motion to dissolve the district court's injunction. Id. at 1129–30. Seneca did not respond to the motion. Id. at 1136. The district court dissolved the injunction the day after the filing of the stipulated motion. Id.

## VIII.   Partial Termination and Modification of the Contract

On September 30, 2014, the Regional Forester requested that, in light of the results of the revised 2014 EA, the Chief of the Forest Service "partially terminate the Trapper sale pursuant to contract provision CT8.24 (07/01), paragraph (b)(i), (ii), and (v)." Id. at 1141. As explained above, those provisions allow termination of the contract in whole or in part where the Chief determines that its continuation would "[c]ause serious environmental degradation or resource damage"; "[b]e significantly inconsistent with land management plans"; or "[a]dversely affect species listed as threatened or endangered under the Endangered Species Act, 16 USC 1531, et seq., or a sensitive specifies identified by the Regional Forester pursuant to BT6.25." Id. at 331.

The Director of Forest Management responded on behalf of the Chief, denying the request to terminate and directing the Regional Forester to "attempt to work out [with Seneca] the terms of a partial cancellation and environmental modification in the form of a settlement agreement." Id. at 1143. To that end, on January 21, 2015, the contracting

officer met with a representative of Seneca to present a "proposed [contract] modification package." Id. at 1145.

Ultimately, the parties did not reach agreement concerning the modification of the contract. Instead, on August 18, 2015, Seneca filed a fourteen-page certified claim with the contracting officer, declaring that a material breach had occurred when the Forest Service announced its intent to implement a revised Trapper Project, stating that it would not perform further under the contract, and asserting entitlement to damages in the amount of $4,440,369. Id. at 1146. In its claim, Seneca declared that "all of [its] obligations and [the] Forest Service's rights under the contract are terminated." Id. At the same time, however, Seneca advised the contracting officer that to "mitigate its loss" it would perform on the revised Trapper Project "if and to the extent that doing so will not prejudice this claim in any way." Id.

On April 8, 2016, the Regional Forester again requested that the Chief of the Forest Service "partially terminate the Trapper sale pursuant to contract provision CT8.24 (7/01)." Id. at 1170. But this time he requested termination under paragraph (a)—based on "the changes to the sale required in the court-ordered Revised Trapper Project EA and [Decision Notice]." Id. The Regional Forester explained that the contracting officer would complete an environmental "modification to the contract . . . that will allow harvest of 27 of the original 149 acres in the sale" and that "[t]he modification will be done in conjunction with the partial termination." Id. at 1169–70.

On May 9, 2016, the Acting Director of Forest Management approved the request to partially terminate the Trapper contract pursuant to provision CT8.24(a) under the authority delegated to him pursuant to 36 C.F.R. 223.116(b). Id. at 1172. In a letter to Seneca notifying it of the partial termination, the Acting Director explained the "decision to terminate the sale [was] the result of changes that the Willamette National Forest . . . made to the Trapper Project following the district court's [injunction]." Id. at 1171. The Acting Director noted that the decision flowed from the issuance of the "Revised Trapper Project EA on May 19, 2014" and the "new [Decision Notice, which] included substantial changes to the original Trapper Timber Sale." Id. The letter notified Seneca that "[c]ompensation to [it] for this termination will be determined per CT8.24-Termination (7/01) (a), to be calculated under CT9.53-Settlement for Administrative Appeal or Litigation (7/01)," and that the contracting officer "has prepared and will present [Seneca] with a modification to the Trapper Timber Sale contract reflecting the required changes and partial termination." Id. The partial termination eliminated harvest on all but twenty-seven acres. Id.

Also on May 9, the contracting officer issued his final decision denying Seneca's claim of material breach. Id. at 1173. The contracting officer explained that "[p]ertaining to any partial cancellation and environmental modification of the Trapper Timber sale offered to [Seneca], as stated in CT9.51 and CT9.53 '[Seneca] agrees its sole and exclusive remedy shall only be Out-of-Pocket expenses.'" Id. at 1187. The contracting officer determined that the government owed Seneca $141,327.98 in unrecovered out-of-pocket expenses but was not entitled to the more than four million dollars in damages that it claimed. Id. The contracting officer found that "the Forest Service complied with [the

district court's injunction in Cascadia Wildlands] and [the judge] was ultimately satisfied," and thus "the Forest Service did not breach the contract." Id. at 1185. "The contract anticipated and authorized suspensions to perform court-ordered environmental analysis," the contracting officer found, and moreover, the "Forest Service . . . applied the contractually specified remedies for those suspensions." Id.

A few days later, on May 12, the contracting officer sent Seneca "the unilateral modification of the sale which reflects the required changes and partial termination," of the contract, which "h[ad] been terminated in part as stated in the May 9, 2016[] letter from Frank R. Beum, Acting Director of Forest Management." Id. at 1189. The contracting officer notified Seneca that, "[a]s stated in the CT9.53- Settlement for Administrative Appeal or Litigation," its "sole and exclusive remedy shall be reimbursement for Out-of-Pocket Expenses," which the contracting officer calculated as $147,104.39. Id.; see also id. at 1192–95 (modified contract).

## IX.   Seneca Performs Harvesting Operations Consistent with the Modified Contract

On March 10, 2017, Seneca sent an email to the contracting officer with questions regarding the "revised contract." Id. at 1196. The contracting officer responded by a letter dated May 3, 2017. Id. at 1197. He requested that Seneca submit an updated General Plan of Operations if it, in fact, "plan[ned] to operate the Trapper Timber Sale contract." Id. The contracting officer informed Seneca that the Forest Service "is not implicitly accepting Seneca's offer to mitigate its damages," that it "maintains that the contract remains in effect" and that it "disagree[d]" with Seneca's assertion "that the contract has been breached." Id. at 1197 (internal punctuation omitted).

Seneca responded by letter of May 5. Id. at 1200. It advised the contracting officer that Seneca intended to "operate" the portion of the Trapper sale that was within the revised project area. Id. At the same time, it acknowledged "that the parties have a difference of opinion as to whether the Trapper Contract is in effect versus breached." Id. According to Seneca, it and the Forest Service were "basically agreeing to disagree while others work to resolve the legal dispute." Id. Seneca performed the timber harvest on the twenty-seven acres allowed under the modified contract during the normal operating seasons in 2017 and 2018. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 9, ECF No. 56.

## X.   This Action

Seneca filed its complaint in this court on August 12, 2016. ECF No. 1. On October 14, 2016, the government filed a motion to dismiss for failure to state a claim, ECF No. 6, which the Court denied on March 29, 2017, ECF No. 15.

Seneca filed an amended complaint on November 2, 2018. ECF No. 37. A period of discovery followed after which the government filed the present motion for summary judgment on July 25, 2019. ECF Nos. 47–49. Seneca filed its opposition to that motion and supporting appendix on October 4, 2019, ECF No. 56, and the government filed its reply on October 25, 2019, ECF No. 60. Oral argument was held via video conference on April 15, 2020. ECF No. 65.

## DISCUSSION

### I.     Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [i.e., the Contract Disputes Act]." Id. § 1491(a)(2). The Contracts Disputes Act requires a contractor to submit a valid claim, meaning "a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1328 (Fed. Cir. 2010). Additionally, "the contractor must have received the contracting officer's final decision on that claim." Id. (citing James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)). An action in this court under the Contracts Disputes Act "must be based on the same claim previously presented to and denied by the contracting officer." Scott Timber Co. v. United States (Scott Timber I), 333 F.3d 1358, 1365 (Fed. Cir. 2003) (internal quotation marks omitted). This requirement, however, does not "require rigid adherence to the exact language or structure of the original [Contracts Disputes Act] claim." Id.

The jurisdictional requirements are satisfied in this case. Seneca submitted a written claim to the contracting officer on August 18, 2015 alleging a material breach of contract. Def.'s App. at 1146. The claim contained both its basis and amount, and references a cause of action for material breach of contract that is the same as the one it brings in this court. Id. at 1146–59. The contracting officer issued a final decision on May 9, 2016. Id. at 1173, 1188. Seneca Sawmill filed its complaint in this court on August 12, 2016—three months after receiving notice of the final decision of the contracting officer. ECF No. 1.

### II.    The Government's Motion for Summary Judgment

#### A.    <u>Applicable Standards</u>

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rules of the Court of Federal Claims ("RCFC") 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

"The moving party bears the burden of establishing the absence of any genuine issue of material fact," and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### B.      Merits

In its amended complaint, Seneca contends that the Forest Service "breached its implied duty to cooperate and not to hinder performance of plaintiff's timber sale contract" by "go[ing] beyond addressing the two deficiencies that led to the federal court injunction [and] proceeding with an environmental assessment that reexamined the Trapper Timber Sale under then current 2013 policy and direction." 1st Am. Compl. ¶ 13, ECF No. 37. "In addition," Seneca alleges, "the Forest Service breached its contractual obligation set out in . . . CT8.24 and CT9.53 not to modify or terminate a timber sale contract to comply with a court order unless the contracting officer made a determination that the modification or termination was 'necessary for correction of the deficiencies raised by the appeal or lawsuit.'" Id.

The government seeks summary judgment as to liability for breach of contract on several grounds. First, it argues that—because Seneca participated in the <u>Cascadia Wildlands</u> litigation as an intervenor—the doctrines of issue and claim preclusion bar it from arguing that the Forest Service went further than the district court's order required when it issued the revised 2014 EA that resulted in partial termination of the contract. Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 17, ECF No. 47. Second, it argues that Seneca cannot bring an action for breach of contract in light of CT8.24, which authorizes the Forest Service to terminate the contract for a number of reasons, including "to comply with a court order." <u>Id.</u> at 20. Third, the government contends that Seneca's duty of good faith and fair dealing argument lacks merit as a matter of law. <u>Id.</u> at 21; <u>see also</u> Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 7, ECF No. 60. Finally, and in any event, the government contends, because Seneca performed on the modified contract it cannot pursue a claim for total breach. Def.'s Mot. at 22.

For the reasons set forth below, the Court: 1) holds that the government's res judicata arguments lack merit; 2) finds that—although neither party has addressed the question—it is unclear that the Forest Service can rely on CT8.24(a) where, as here, the immediate result of the court order is not to terminate the contract (in whole or in part), but instead to require the Forest Service to conduct a new or supplemental EA that may or may not result in termination; 3) concludes that, in any event, there is a factual dispute regarding whether the environmental assessment the Forest Service did conduct was more extensive than required to comply with the court order; 4) observes that even if Seneca ultimately demonstrates that CT8.24(a) did not justify the partial termination of the contract, the government may be able to rely upon the doctrine of constructive termination by establishing that it could have invoked any of the grounds for termination set forth in CT8.24(b); 5) holds that the government is entitled to summary judgment as to Seneca's claim based on the duty of good faith and fair dealing; and 6) rejects the government's contention that Seneca's performance on the modified contract precludes it from bringing a claim for breach.

### 1.      The Government's Argument that Seneca's Claims Are Barred by Issue and/or Claim Preclusion

As noted, the government argues that Seneca's breach of contract claims are barred by issue preclusion or, in the alternative, claim preclusion. Def.'s Mot. at 18. Neither argument is persuasive.

### a.    Issue Preclusion

The doctrine of issue preclusion "precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment." Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1594 (2020) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)); see also New Hampshire v. Maine, 532 U.S. 742, 748–49 (2001)) (explaining that issue preclusion prevents "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim"). To establish issue preclusion, a party must show that "(1) a prior action presents an identical issue; (2) the prior action actually litigated and adjudged that issue; (3) the judgment in that prior action necessarily required determination of the identical issue; and (4) the prior action featured full representation of the estopped party." Stephen Slesinger, Inc. v. Disney Enterprises, Inc., 702 F.3d 640, 644 (Fed. Cir. 2012) (citing Laguna Hermosa Corp. v. United States, 671 F.3d 1284, 1288 (Fed. Cir. 2012)).

These four criteria have not been met in this case because: 1) the issues presented in Cascadia Wildlands and this case are different; 2) the issues presented here were not actually litigated and adjudicated in Cascadia Wildlands; and 3) the judgment in that case did not require determination of the issues before this Court. This is an action for damages based on breach of contract, not an action under NEPA or the APA. To adjudicate the case, this Court must decide, among other things: 1) whether the contract itself provided a remedy for the Forest Service's partial termination of the Timber sale contract, thereby foreclosing an action for breach of contract; and 2) whether the implied duty of good faith and fair dealing required the Forest Service to tailor the actions it took to comply with the district court's order to reduce to the greatest extent possible their impact on Seneca's rights under the contract.

The district court in Cascadia Wildlands did not address or decide any of these issues because the only question before it was whether there was new information before the Forest Service which obligated it under NEPA to revisit the decisions it made on the basis of the 2003 EA. The court answered that question in the affirmative and enjoined the timber sale pending the Forest Service's preparation of a supplemental EA and Decision Notice that addressed new information regarding the northern spotted owl and "the learning value of the project." Cascadia Wildlands, 791 F. Supp. 2d at 993. It then dissolved the injunction pursuant to the parties' stipulation that the revised 2014 EA and Decision Notice reflected compliance with that order.

The district court had no occasion to address the issue Seneca presses here. That issue is whether the agency's revised 2014 EA and Decision Notice were tailored to address only the two issues that were the subject of the district court's order or whether the Forest Service violated the duty of good faith and fair dealing by allegedly expanding its scope. In that regard, the Court is not persuaded by the government's argument that the district court effectively decided whether the agency breached the contract when it ruled on Seneca's motion for clarification. As described above, Seneca asked the district court to clarify in advance the parameters of the agency's discretion in responding to the court's direction that it prepare a supplemental EA to address the two areas of concern the court identified. Specifically, Seneca requested that the district court clarify that its order "[did] not require the Court-ordered supplemental EA to start from scratch on issues either not found deficient by the Court or not challenged by plaintiff." Def.'s App. at 749 (Seneca's motion for clarification). The court declined to clarify its order as Seneca

15

requested because the Forest Service itself did not seek clarification and because the court did not want to issue an order that "might be construed as limiting the broad discretion the Forest Service has in determining the scope of a supplemental EA." Id. at 896–97 (district court order on Seneca's motion for clarification).

Neither the motion for clarification nor the district court's ruling on the motion addressed the breach of contract issues before this Court, as the government argues. For one thing, the district court did not address the actions the agency actually took in response to the court order because Seneca filed its motion before the agency acted. Moreover, the district court had no occasion after the Forest Service issued its revised 2014 EA to decide whether, in fact, the Forest Service had taken more than the minimum action required to comply with its order. To the contrary, it dissolved the injunction based on the parties' stipulation that the Forest Service had completed a revised EA to address the court's injunction and that on July 12, 2014 the agency issued a Decision Notice authorizing a revised Trapper Project. Id. at 1130. Moreover, Seneca could not have validly challenged the lifting of the injunction on the grounds that the Forest Service exceeded the requirements the district court had imposed.

### b.    Claim Preclusion

The government's argument that this suit is barred by claim preclusion is also unavailing. Claim preclusion forecloses litigation of matters in the second suit that were not but should have been litigated in the earlier suit. Phillips/May Corp. v. United States, 524 F.3d 1264, 1267 (Fed. Cir. 2008) (citing 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4402 (2d ed. 2002)). It applies where: "(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." Cunningham v. United States, 748 F.3d 1172, 1181 (Fed. Cir. 2014) (citing Ammex, Inc. v. United States, 334 F.3d 1052, 1055 (Fed. Cir. 2003)).

The doctrine of claim preclusion does not apply here because its underlying premise is that Seneca could have litigated its breach claims in the district court. But jurisdiction over breach of contract claims against the United States is vested exclusively in the Court of Federal Claims where, as here, the plaintiff seeks an award of damages in excess of $10,000. 28 U.S.C. § 1346(a)(2). And as the court of appeals observed in Cunningham v. United States, claim preclusion is inapplicable where a plaintiff is unable to "seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority." Id. at 1179 (quoting Restatement (Second) of Judgments § 26(1)(c) (Am. Law Inst. 1982)).

Further, and in any event, the claims the parties presented to the district court in Cascadia Wildlands arose under NEPA. Neither the plaintiffs nor the government suggested that the contract between the Forest Service and Seneca had any bearing on those claims. Claim preclusion therefore does not apply because—even if the district court could have exercised jurisdiction—it is doubtful that Seneca, a permissive intervenor, had the right to add a new issue like breach of contract, which was not raised by the parties in the case before the district court. 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1921 (3d ed. 2020) (noting that it is up to the discretion of the court whether a permissive

intervenor can raise permissive counterclaims and if "a proposed counterclaim will cause undue delay or prejudice to the existing parties, intervention should be denied").

The government's reliance on <u>Oregon Natural Resources Council Action v. United States Forest Service</u> to support its claim preclusion argument is misplaced. 445 F. Supp. 2d 1211, 1220 (D. Or. 2006). In that case, the Forest Service defended the narrow scope of the actions it took on remand in a NEPA suit on the basis of certain timber sales contracts. Its supplemental EA started with "the premise that it has already awarded contracts for the harvest of the six timber sales, and that the purchasers of those contracts have existing legal rights to harvest the timber sales subject to certain limited authority in the agency to modify or terminate the contracts in defined circumstances." <u>Id.</u> at 1219–20. The district court rejected the government's argument on the merits, holding that the contracts did not constrain the Forest Service's discretion to act in response to the court's order. In fact, the district court observed, the Forest Service had the authority under the contracts to terminate them in whole or in part to prevent environmental damage.

According to the government, the fact that the court considered the impact of the timber sales contracts in <u>Oregon Natural Resources Council</u> means that "if Seneca believed that it had a right—whatever the source—to limit the scope of the Forest Service's response to the district court's order, it needed to present those arguments to the district court." Def.'s Reply at 5. But in <u>Oregon Natural Resources Council</u>, the court interpreted the contract for purposes of determining the Forest Service's obligations under NEPA, and not, as in this case, to decide whether a contractor is entitled to damages for its breach. In that case, unlike this one, the contract was interjected into the litigation by the government to defend the sufficiency of its actions under NEPA. Because neither party raised the contract as an issue in <u>Cascadia Wildlands</u>, Seneca, as intervenor, lacked the right to raise it on its own. <u>Oregon Natural Resources Council</u> is therefore inapposite.

## 2. The Government's Argument that the Termination Was Authorized Under the Contract

The government argues that Seneca cannot bring an action for breach of contract based on the partial termination because the contract itself contemplates that the Forest Service had the authority to terminate it and the contract provides specified remedies when that authority is exercised. <u>See</u> Def.'s Mot. at 19–22. Therefore, according to the government, "[t]o establish a breach of contract, Seneca would need to establish that neither the termination provision, CT8.24, nor any other contract provision, covers the circumstances giving rise to its claim." <u>Id.</u> at 20.

The principle of law the government cites is well established. "[A] contractor cannot maintain a breach claim for which [] contractual relief is available." <u>Hoel-Steffen Constr. Co. v. United States</u>, 456 F.2d 760, 768 (Ct. Cl. 1972)); <u>see also</u> <u>Crown Coat Front Co. v. United States</u>, 386 U.S. 503, 511 (1967). Nonetheless, the Court disagrees that it was <u>Seneca's</u> burden to show that none of the provisions in the contract authorized the partial termination. The Forest Service relied on a particular contractual provision: CT8.24(a). Therefore, as discussed below in connection with "constructive termination" precedent, if the government wishes to avoid liability for breach on grounds other than the applicability of CT8.24(a), it is the <u>government's</u> burden to

show that it could have invoked other provisions of the contract to effect the partial termination. But its motion for summary judgment does not address the issue at all.

In addition, summary judgment is inappropriate because the Court is not convinced that CT8.24(a) was properly invoked. As noted above, CT8.24(a) states in pertinent part that the Chief of the Forest Service may terminate the contract in whole or in part "[t]o comply with a court order." Def.'s App. at 331. In this case, the district court did not order the partial termination of the contract; it ordered the Forest Service to conduct a supplemental EA to address new information regarding the presence of an endangered species and the continued learning value of the Trapper Project. It was the Forest Service that made the decision that partial termination was required on the basis of the results of the revised 2014 EA.

As the district court in Cascadia Wildlands recognized when it denied Seneca's motion for clarification, "[t]he Forest Service has 'considerable discretion' in determining the scope of its supplemental National Environmental Policy Act (NEPA) analysis." Id. at 897 (quoting N.W. Res. Info. Ctr. Inc. v. Nat'l Marine Fisheries Serv., 56 F.3d 1060, 1066 (9th Cir. 1995)). The district court expressly declined to restrict the Forest Service in its exercise of that discretion in the wake of its decision. Although Seneca has not so argued (and neither party has briefed the question), it is unclear to the Court that CT8.24(a) covers terminations in these circumstances where, as here, the intervening decisions of the Forest Service and not compliance with a court order itself is their immediate cause.

In any event, even if CT8.24 could be read to apply where the court order is not the immediate cause of the termination of the contract, the Court agrees with Seneca that factual disputes exist regarding whether the Forest Service prepared the revised EA on which the partial termination was based for reasons other than—or at least in addition to—bringing the project into compliance with the district court's decision. For example, the district court's order required the Forest Service to conduct a "supplemental" EA to address the two categories of new information it specified. The Forest Service decided, however, that "[b]ecause 10 years have passed since the original environmental assessment," it would "completely revis[e] [its] assessment and decision, rather than complet[e] a supplement." Id. at 1006 (emphasis supplied); see also id. at 900 (public notice) (stating that in conducted its environmental assessment the Forest Service intended to "address new information regarding the northern spotted owl, address the 'value of learning,' and bring the 2003 environmental analysis up to date with current policy and direction" (emphasis supplied)).

In addition, the record shows that in his September 30, 2014 request to terminate the contract, the Regional Forester recommended terminating pursuant to provisions other than CT8.24(a) (to comply with a court order). Specifically, he recommended termination pursuant to CT8.24(b)(i), (ii), and (v) (based on environmental degradation, compliance with certain land management plans, and threatened and endangered species, respectively). See id. at 1141. In fact, he specified the amount of acreage that he believed should be removed from the sale based on each provision. Id. (table stating that ninety-eight out of the 149 total acres subject to the sale should be removed pursuant to CT8.24(b)(i) and (ii), and that twenty-four acres should be removed pursuant to CT8.24(b)(v)).

18

For these reasons, the Court agrees with Seneca that the government is not entitled to summary judgment as to whether termination under CT8.24(a) was justified. It does not agree, however, with Seneca's argument that the Forest Service failed to comply with CT9.53, the provision under which compensation for terminations under CT8.24(a) is calculated.

Seneca's argument is based on the second paragraph of CT9.53, which provides that "[i]n the event of modification by [the] Contracting Officer or partial termination, changes to the contract shall be limited to those determined by the Contracting Officer to be necessary for correction of the deficiencies raised by the appeal or lawsuit." Id. at 335. According to Seneca, that provision required the contracting officer to independently determine what changes were required to correct the deficiencies that the district court identified in Cascadia Wildlands. But here, Seneca observes, the contracting officer made no determination regarding what changes the court order required. For example, it notes that the contracting officer admitted during his deposition that he did not assess "whether or not addressing Red Tree Voles was something [the district court's] order required" or "whether a particular change to the Trapper Sale contract to a particular unit was actually required [by the district court] or not." Pl.'s Resp. at 16.

Seneca has misinterpreted CT9.53. The "partial termination" to which the cited proviso refers is effected by the Chief of the Forest Service under CT8.24(a), and the remedy to which Seneca was entitled as a result of that termination (out-of-pocket expenses) is set forth in the first paragraph of CT9.53. The second paragraph of CT9.53 tasks the contracting officer with determining what changes are needed in the language of the contract to implement the Chief's partial termination decision under CT8.24(a).

It is unreasonable to interpret the cited paragraph as requiring the contracting officer to determine what actions the Forest Service was required to take to comply with the district court's order in Cascadia Wildlands. By the time the contracting officer modified the contract here, the scope of the partial termination had already been determined by the Chief of the Forest Service exercising his authority under CT8.24(a). See Def.'s App. at 1189 (letter from contracting officer to Seneca accompanying contract modification) ("Trapper Timber Sale has been terminated in part as stated in the May 9, 2016, letter from Frank R. Beum, Acting Director of Forest Management."). Further, it would be anomalous for a contracting officer to be tasked with deciding what actions the Forest Service was or was not required to take to comply with the court order or with NEPA. Those kinds of determinations are the province of the agency's program staff, counsel, and other NEPA experts. The contracting officer's job is to make the changes to the contract language that are needed to implement those decisions.

Finally, while the Court is not prepared to conclude as a matter of law that CT8.24(a) authorized the partial termination the Forest Service effected, neither party has briefed the question whether, and to what extent, the Forest Service might have instead partially terminated the contract based on one or more of the contingencies set forth in CT8.24(b), as the Regional Forester originally recommended. If so, then the government may be able to rely upon the theory of constructive termination to limit Seneca to the remedies it would be entitled to under those provisions. See Maxima Corp. v. United States, 847 F.2d 1549, 1553 (Fed. Cir. 1988) (finding of constructive termination "may be appropriate 'in situations in which the government has stopped or curtailed a contractor's performance for reasons that turn out to be questionable or invalid'") (quoting Torncello v. United States, 681 F.2d 756, 759 (Ct. Cl. 1982)); G.C. Casebolt Co. v.

19

United States, 421 F.2d 710, 712 (Ct. Cl. 1970) (stating that where a contract contains a termination-for-convenience provision, "a Government directive to end performance of the work will not be considered a breach but rather a convenience termination—if it could lawfully come under that clause," even if the government "wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that [it] can terminate the work on some other ground"); John Reiner & Co. v. United States, 325 F.2d 438, 443–44 (Ct. Cl. 1963) (holding that although the original grounds for terminating the contract were not valid, the contract could have been cancelled pursuant to the termination for convenience clause and therefore damages would be limited to those allowable under that provision); Reservation Ranch v. United States, 39 Fed. Cl. 696, 720–21 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (holding that even had the Forest Service termination of the timber harvest contract pursuant to provisions related to protecting threatened or endangered species been inappropriate, cancellation could have been sustained because there existed two other "independent adequate ground[s]" for termination, namely for protection of "sensitive species" or "to comply with a court order").

For reasons that are not apparent, the government has not invoked constructive termination as a basis for summary judgment and neither party has discussed it in their supporting briefs. The applicability of that doctrine is critical to determining whether, in fact, Seneca's breach claim is a viable one. In the meantime, for the reasons set forth above, the government's motion for summary judgment must be denied to the extent that it is predicated on the position that the partial termination of the contract was authorized under CT8.24(a).

### 3.     Seneca's Contention that the Forest Service Breached the Implied Duty of Good Faith and Fair Dealing

In addition to arguing that the Forest Service lacked grounds to partially terminate the contract under CT8.24(a), Seneca contends that—in any event—the agency breached its implied duty of good faith and fair dealing in the course of responding to the court order in Cascadia Wildlands. Specifically, Seneca alleges that the agency breached the implied duty to cooperate and not hinder performance of plaintiff's timber sale contract when it decided "to go beyond addressing the two deficiencies that led to the federal court injunction by proceeding with an environmental assessment that re-examined the Trapper Timber Sale under then current 2013 policy and direction." 1st Am. Compl. ¶ 13. According to Seneca, the implied duty of good faith and fair dealing obligated the Forest Service "to modify the contract only as necessary to comply with the terms of the court order." Pl.'s Resp. at 17. The Court disagrees.

A duty of good faith and fair dealing is implied in all contracts with the United States. It "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citing, among others, Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981)). As the court of appeals has observed, the duty "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." Metcalf Constr. Co., Inc. v. United States, 742 F.3d 984, 991 (Fed. Cir. 2014). In fact, "prohibit[ing the government] from interfering with the plaintiffs' enjoyment of the benefits contemplated by the contract . . . is among the core

functions served by the implied covenant of good faith and fair dealing." <u>Centex Corp.</u>, 395 F.3d at 1306.

In general, "what th[e] duty entails depends in part on what th[e] contract promises (or disclaims)." <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 830 (Fed. Cir. 2010). "That is evident," the court of appeals has explained, "from repeated formulations that capture the duty's focus on 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" <u>Metcalf Constr. Co.</u>, 395 F.3d at 991 (quoting Restatement (Second) of Contracts § 205 cmt. a (Am. Law Inst. 1981)).

As noted, Seneca's contention here is that the agency violated its duty of good faith and fair dealing when it employed the Forest Service's updated NEPA guidance and standards to determine the timber sale's environmental consequences, where the court's order allegedly did not require it to do so. In effect, according to Seneca, the terms of the timber sale contract constrained the agency's exercise of its discretion to assess the ongoing environmental impact of the Project and to take action as it deemed necessary to address that impact.

Seneca's argument puts the contract on a collision course with NEPA, because "[e]ven after awarding the timber sale contracts, the Forest Service had the obligation to comply fully with NEPA, including, potentially, uncovering new information and objectively considering in the course of the remand whether the contract 'would cause serious environmental degradation,' requiring its termination." <u>Or. Nat. Res. Council</u>, 445 F. Supp. 2d at 1220. In fact, "[t]he Ninth Circuit has made it clear that an agency may not limit its obligations to prepare an environmental assessment that complies with NEPA by entering into a contract." <u>Id.</u> (citing <u>Metcalf v. Daley</u>, 214 F.3d 1135, 1139 (9th Cir. 2000)).

The court of appeals' decision in <u>Precision Pine</u> is instructive. That case, like this one, involved timber sale contracts that were interrupted as a result of a court order. In <u>Precision Pine</u>, the district court ordered a suspension of further timber harvesting under the contracts until the Forest Service consulted with the FWS about the pertinent land resource management plans, as required by the Endangered Species Act. 596 F.3d at 822–23. Although the contract authorized the suspension to comply with a court order, the plaintiffs contended that the actions the Forest Service took during the court-ordered suspension caused it to be unreasonably prolonged, thereby violating the implied duty of good faith and fair dealing.

The court of appeals observed that "[c]ases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch." <u>Id.</u> at 829. "First," it observed, "the government enters into a contract that awards a significant benefit in exchange for consideration." <u>Id.</u> "Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract." <u>Id.</u>

The court held that the Forest Service did not breach the implied duty of good faith and fair dealing in <u>Precision Pine</u> because: 1) there was no evidence that the delays were undertaken "for the specific purpose of eliminating an express, bargained-for benefit in the contracts"; and 2) the Forest Service "did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that the Precision Pine's performance would proceed

uninterrupted." Id. at 829–30 (citing Centex Corp., 395 F.3d at 1306). To the contrary, the court of appeals observed, "the plain language of the contracts state their provisions may be modified, suspended, or even canceled to comply with the ESA." Id. at 830–31. "If anything," therefore, the contract "expressly contemplate[d] and allow[ed] the Forest Service to interfere with Precision Pine's performance." Id. at 831. The court of appeals concluded that the provisions governing the contract's suspension or termination "ma[d]e clear that one 'benefit' the parties did not contemplate, and which Precision Pine is thus not entitled to under the contracts, is the guarantee of uninterrupted performance." Id.

In this case, there is similarly no evidence (or even argument by Seneca) that the Forest Service specifically targeted Seneca's benefits by conducting an EA that went beyond the specific deficiencies the district court identified in Cascadia Wildlands. To the contrary, the undisputed evidence shows that the Forest Service initially declined in 2010 to revisit the 2003 EA and Decision Notice, that it then defended its decision in the district court, and that it was not until it was ordered by the court to prepare a supplemental EA that it revisited the determinations it made in 2003. See Def.'s App. at 585, 677–713.[8]

Moreover, Seneca—like Precision Pine—could not have reasonably expected to harvest all of the acreage in the contract in the event that the agency reasonably concluded that changes were needed either to comply with a court order or because of new information relevant to the sale's environmental impact. To the contrary, the contract's suspension and termination provisions were designed to address those contingencies. Therefore, here, as in Precision Pine, the government did not appropriate a benefit that Seneca could have reasonably contemplated it would enjoy under the contract.

There is no merit to Seneca's contention that the decisions in Zip-O-Log Mills, Inc. v. United States, 113 Fed. Cl. 24 (2013), and Wetsel-Oviatt Lumber Co. v. United States, 38 Fed. Cl. 563, 564 (1997), show that the Forest Service may be held liable for a breach "where the government's action in response to a court-ordered injunction failed, as here, to comply with its duty to modify the contract only as necessary to comply with the terms of the court order." Pl.'s Resp. at 17. To the contrary, neither case involved a claimed violation of the duty of good faith and fair dealing or addressed the Forest Service's liability for allegedly exceeding the terms of a court order in its modification of a timber sales contract.

In Zip-O-Log Mills, the court analyzed the issue of how to identify the precise time at which a timber sale contract was terminated for purposes of calculating compensation under the contract's termination clause. 113 Fed. Cl. at 26. A district court had enjoined the sale pending the preparation of a supplemental EA. The court held that the effective termination date of the contract was the date that the Forest Service decided not to prepare the supplemental EA because that decision "had the effect of preventing the possibility of any logging on the affected sales."

---

[8] Although the court of appeals has since clarified that Precision Pine's proof of "specific targeting" is not generally required to establish a violation of the duty of good faith and fair dealing, that requirement remains in cases like the present one, where imposition of the duty may "trench on responsibilities imposed on the contracting agency independent of contracts." Metcalf Constr. Co., 742 F.3d at 993.

Id. at 30. In Wetsel-Oviatt Lumber, the court similarly held that two timber sale contracts had been effectively terminated where the Forest Service suspended portions of these contracts, deleted timber from the contracts for environmental reasons, and conceded that it did not intend to ever release the timber to the plaintiff. 38 Fed. Cl. at 567–68, 570.

As is readily apparent, what was at issue in both of these cases was the implementation of the contracts' express termination provisions, not any implied obligation of good faith and fair dealing. The opinions in those cases have no bearing on Seneca's claims. Therefore, for the reasons set forth above, the Court concludes that Seneca cannot rely on the duty of good faith and fair dealing to challenge the agency's decision to partially terminate the contract in compliance with the revised EA it prepared after the court issued its decision in Cascadia Wildlands.

### 4.    The Government's Argument that Seneca Waived Its Right to Seek Damages for Breach under the Original Contract by Performing on the Modified Contract

It is well established that where there has been a material breach of contract the non-breaching party may choose to either cancel the contract or continue it. Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976). In particular, the non-breaching party "cannot continue after a material breach by the other . . . , act as if the contract remains fully in force . . . , run up damages, and then go suddenly to court." N. Helex Co. v. United States, 455 F.2d 546, 551 (Ct. Cl. 1972).

The government contends that in this case, although Seneca stated in its August 18, 2015 certified claim that the Forest Service was in material breach of the original contract, it opted to continue performance on the modified contract, thereby waiving its right to bring a suit for breach of contract. Def.'s Mot. at 22–23 (citing Cities Service Helex, Inc., 543 F.2d at 1314 ("The continued acceptance of benefits under the contract is the most common and clearest case of election by contract.")). This argument lacks merit.

"Waiver is an affirmative defense," which the breaching party must prove. Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360 (Fed. Cir. 2005) (citing Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1299 (Fed. Cir. 2002)). And "[w]hen the government knows of the non-breaching party's timely reservation of rights in protest to the breach, the acceptance of [benefits] from the government does not waive the party's rights arising from the breach." Id. (citing N. Helex Co., 455 F.2d at 555); cf. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 637 (Ct. Cl. 1973) (finding waiver where "[n]ot only was performance continued normally, but no reservation of rights was made known").

A reservation of rights may be express or implied. Westfed Holdings, 407 F.3d at 1360. Here, Seneca expressly reserved its rights and made the Forest Service aware of its position before the contract was terminated. Specifically, when Seneca filed its certified claim alleging material breach of contract, it notified the contracting officer that "[t]o mitigate its loss, Seneca stands ready, willing and able to perform the portion of the Trapper timber sale contract that is encompassed within the Revised Trapper Project if and to the extent that doing so will not prejudice this claim in any way." Def.'s App. at 1146. In addition, before it began performance

on the modified contract some two years later, Seneca advised the Forest Service of its intent to "operate the Trapper Timber Sale, i.e., that portion of the Trapper Sale within the revised project area." Id. at 1200. It further "acknowledge[d] that the parties have a difference of opinion as to whether the Trapper Contract is in effect versus breached," but stated that "Seneca and the Forest Service are basically agreeing to disagree while others work to resolve the legal dispute." Id. The undisputed facts show therefore that the Forest Service was aware of Seneca's reservation of its rights, even if, as the government notes, it took exception to Seneca's position. Def.'s Mot. at 23; see N. Helex, 455 F.2d at 553 (noting that the breaching party's "assent is not a prerequisite" to a proper reservation of rights (citing U.C.C. § 1-207 (Am. Law Inst. & Unif. Law Comm'n 1990))).

The government argues nonetheless that the holding in Northern Helex—that there is no waiver where a non-breaching party continues to perform while expressly reserving its rights—is inapplicable to this case. It so argues because of the unique justifications the non-breaching party offered for its continued performance in Northern Helex. The Court finds the distinctions the government has identified immaterial.

Northern Helex involved an alleged failure of the government to make payments under a helium sales contract. The contractor continued to perform and deliver helium to the government in part because the properties of helium made it impracticable for it to cease production. On the other hand, the government notes, it was feasible for Seneca to refrain from harvesting timber once the material breach occurred. Def.'s Reply at 15 (stating that "the trees were not going to escape into the atmosphere and be wasted" if Seneca ceased performance). But as the Court of Claims later clarified in Ling-Temco-Vought, Inc. v. United States, the unique circumstances found relevant in Northern Helex were not indispensable to the outcome because the decision "rested, equally, on the significant facts that th[e] contractor had made an express reservation of its rights when it continued performance." 475 F.2d at 637 (discussing N. Helex, 455 F.2d at 552–53, 553); see also Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 649 (2004) (citing N. Helex, 455 F.2d at 552) (stating that the "most glaring distinction" between Northern Helex and the case before it was the former's "emphasis" on it finding that the "plaintiff's continued performance . . . was founded on the required reservation"). Further, Seneca also had good reason for continuing to harvest timber under the modified contract, notwithstanding the breach. It had an obligation to mitigate its damages. And in light of the unique characteristics of the timber being sold, the best way to do that was to continue to perform, notwithstanding that the acreage available under the modified contract was greatly reduced because of the alleged breach.

In short, the government's argument that Seneca waived its rights by performing on the modified contract lacks merit. The government's motion for summary judgment on this ground is therefore denied.

### C.   The Government's Motion Concerning the Calculation of Damages

The government asks the Court to grant partial summary judgment regarding the measure of damages and hold as a matter of law that "Seneca's method of claiming 'replacement log costs,' based on catalog prices rather than its actual cost data, is inadequate." Def.'s Mot. at 24. The Court concludes that it would be premature to determine whether Seneca is entitled to rely

upon catalog prices in the context of a motion for summary judgment. For one thing, if the Court ultimately finds constructive termination of the contract under CT8.24(b), then it will be unnecessary to decide the issue because Seneca would be entitled only to the damages remedy provided in the applicable provisions of CT9.51 or CT9.52. In addition, should it be necessary to reach the question, the Court believes that the propriety of Seneca's proposed methodology should be decided on the basis of a full record, including the expert testimony Seneca intends to present. The government's motion for partial summary judgment as to calculation of damages is therefore denied.

**CONCLUSION**

The government's motion for summary judgment is **GRANTED** as to Seneca's claim that the government violated the duty of good faith and fair dealing. It is otherwise **DENIED.** The parties shall file a joint proposed pre-trial schedule within thirty days, consistent with Appendix A to the Rules of the Court of Federal Claims.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge