# In the United States Court of Federal Claims

|  |  |
|---|---|
| SENECA SAWMILL COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16-1001C |
| | ) (Filed: August 19, 2022) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

Michael E. Haglund and Julie E. Weis, Haglund Kelley LLP, Portland, OR, for Plaintiff.

Daniel B. Volk, Senior Trial Counsel, and Jimmy S. McBirney, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were Elizabeth M. Hosford, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Acting Assistant Attorney General. Benjamin Hartman, Office of the General Counsel, U.S. Department of Agriculture, Portland, OR, Of Counsel, for Defendant.

## OPINION AND ORDER

KAPLAN, Chief Judge.

This case arises out of a decision by the United States Forest Service ("Forest Service") to partially terminate a timber sale contract it entered with Plaintiff, Seneca Sawmill Company ("Seneca"). The termination was effected on the basis of a "supplemental environmental assessment" the Forest Service conducted at the direction of the United States District Court for the District of Oregon in Cascadia Wildlands v. U.S. Forest Serv., 791 F. Supp. 2d 979 (D. Or. 2011).

A contracting officer rejected Seneca's claim that the Forest Service breached the contract when it notified Seneca that it would not be permitted to harvest all of the acreage subject to sale under the contract. He concluded that the contract contemplated suspensions and partial terminations of timber harvesting based on a variety of causes, including intervening litigation. Therefore, he found, Seneca could not recover damages for breach of contract, and was limited to the compensation the contract provided. The Chief of the Forest Service determined that Seneca was only entitled to recover its out-of-pocket expenses under the contract because, he concluded, the partial termination was necessary to comply with a court order as provided in the contract.

After the Court granted in part and denied in part the government's motion for summary judgment, see Seneca Sawmill Co. v. United States (Seneca I), 149 Fed. Cl. 83 (2020), a trial was held on Seneca's breach-of-contract claim in November 2021 in Eugene, Oregon. The purpose of the trial was to determine, first, whether the provision of the contract upon which the Forest Service relied, concerning terminations to comply with a court order, covered the partial termination of the timber sale contract. The Court concludes for the reasons set forth below that the Forest Service's invocation of that provision as grounds for partially terminating the contract was improper.

Notwithstanding that conclusion, the parties stipulated at the pre-trial conference that—even if the Forest Service's reliance on the provision addressing terminations to comply with a court order was improper—the agency could have invoked another provision that allows termination where continuation of the contract would cause certain environmental injuries or other adverse effects. In light of that stipulation, the government can rely on the constructive termination doctrine to avoid liability for breach of contract. Therefore, the primary issue before the Court, and the focus of most of the testimony at the trial, was what additional compensation, if any, would have been due Seneca had the Forest Service proceeded under that alternative provision. A subsidiary issue concerns whether Seneca has yet been fully compensated for its out-of-pocket expenses.

The Court has carefully considered the evidence before it and concludes, for the reasons set forth herein, that Seneca has failed to show that—using the measure of compensation set forth in the contract—it is entitled to additional relief. It has also failed to establish its entitlement to additional reimbursement for out-of-pocket expenses. The Court therefore enters judgment in favor of the government.

## FINDINGS OF FACT[1]

### I.    Seneca Sawmill Company

Seneca is the largest lumber producer in Oregon, and one of the largest in the United States. Trial Tr. ("Tr.") vol. 1, 33:11–16. It manufactures commodity-type lumber products that are used in construction projects, chiefly in single- and multi-family homes. Id. 13:18–23, 29:5–9. Seneca operates three sawmills in Eugene, Oregon, id. 25:24; see also Pl.'s Post-Trial Br. ("Pl.'s Br.") at 3, ECF No. 102, and produces more than five-hundred million board feet of lumber per year, Tr. vol. 1, 33:6–10.

Seneca purchases approximately twenty percent of the timber it processes from the Forest Service, the United States Bureau of Land Management, and the Oregon Department of Forestry. Id. 40:20–24. The rest of the timber is sourced from its own land, id. 40:7–19, or is purchased on the "open market . . . from other private timber landowners," id. 40:23–25.

---

[1] This section sets forth the Court's principal findings of fact pursuant to Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the Discussion section.

The majority of the timber that passes through Seneca's mills—whether harvested from its own land or purchased—consists of "second-growth" logs, which are sourced from relatively young trees. Id. 25:3–4, 25:12–16, 28:10–19, 32:2–16, 44:19–45:3, 49:2–5, 204:23–205:4; Pl.'s Br. at 3–4. Such logs have visible, "coarse" growth rings, "representati[ve] of a second-growth log that has grown relatively quickly out in the forest." Tr. vol. 1, 31:4–8.

Seneca also occasionally harvests or purchases timber from older, larger trees, which supply logs of a "much higher quality than [it] normally see[s] in the [commodity] marketplace." Id. 42:1–8; see also id. 41:21–43:18, 48:9–17, 49:12–18; Pl.'s Br. at 4. These "higher-and-better-use" logs are distinguishable by their "fine grain ring count," Tr. vol. 1, 42:2–4, and "clear grain"—that is, by a lack of "knot characteristics" throughout the wood, id. 42:21–23.

Seneca earns a greater profit when it sells high-grade logs to specialty cutting mills than it would if it processed the logs into commodity products in its own facilities, because specialty mills place a premium on the aesthetic value of older logs with a higher ring count. Id. 41:21–43:18 (discussing the "fine grain ring count [of] . . . higher-and-better-use logs" which lack "the knot depictions that you would find in the typical commodity products [Seneca] make[s]"); id. 49:12–18 (Seneca CEO agreeing that, "from a financial standpoint, [it is] important to segregate those logs and resell them as opposed to mill them [at Seneca]," and explaining that "[t]he value [Seneca] receive[s] by selling them is higher than the value we receive if we were to produce it in just the commodity products we make"); see also Pl.'s Br. at 4.[2]

Where the percentage of high-grade logs in a timber sale is relatively small, Seneca brings all of the timber harvested to its complex in Eugene, where the high-grade logs are culled out for sale to specialty cutting mills. Tr. vol. 1, 48:2–17; see also id. 41:21–43:18, 49:12–18; id. 92:5–9 ("If a log comes into our yard that has the higher-and-better-use characteristic, it gets set aside and sold."); Pl.'s Br. at 4. If Seneca expects a high yield of "higher-and-better-use" logs, on the other hand, it sends the logs directly from the harvest site to a specialty cutting mill. Tr. vol. 1, 47:6–48:1.

## II.     The Trapper Timber Sale

The timber sale contract at issue in this case was the product of a forest management effort dubbed "the Trapper Project." Joint Ex. ("JX") 2 at 8–9, 13. The background of the Trapper Project is set forth in detail in the Court's Opinion and Order of July 2, 2020, granting in part and denying in part the government's motion for summary judgment. See Seneca I, 149 Fed. Cl. at 87–94.

---

[2] At trial, Seneca's CEO explained that the decision whether to process timber into commodity logs or sell them to a specialty cutting mill depends on "what the market is for special mills at that time and what the value of lumber is at that time." Tr. vol. 1, 92:15–19. Accordingly, he explained, part of that determination depends on what price a specialty cutting mill offers to Seneca when it advertises logs of a given grade and, often, from a specific stand of timber. Id. 92:20–93:7, 102:12–16.

To recapitulate, the Forest Service initiated the Trapper Project in 1998. JX 2 at 15. Its goal was to study the effects of forest fires by permitting selective timber harvesting in the project area that would replicate the effects of fire on the landscape. See id. at 9, 12; see also JX 3 at 3.

Before it conducted the sale at issue in this case, the Forest Service secured a Biological Opinion from the United States Fish and Wildlife Service ("FWS") to determine whether and to what extent the Project would impact the northern spotted owl, an endangered species. See JX 2 at 15, 70, 75, 121–24, 129–34. That Opinion, issued in September 1998, included a finding that the Trapper timber sale, among others, was "not likely to jeopardize the continued existence of the spotted owl or result in the destruction or adverse modification of spotted owl critical habitat." Id. at 70; see also id. at 134.

The Forest Service then conducted an environmental assessment ("EA") of the project pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–70. See JX 2 (March 2003 environmental assessment, hereinafter "2003 EA"). In May 2003, it issued a Decision Notice and Finding of No Significant Impact ("FONSI") for the Trapper Project. JX 3 ("2003 FONSI"). Relying on the FWS Biological Opinion, the Forest Service concluded that the Trapper Project "may affect" but was "not likely to adversely affect" the northern spotted owl. Id. at 16.

In anticipation of the sale, the Forest Service conducted a timber cruise of the Trapper area on November 20, 2002.[3] Based on the cruise, the Forest Service prepared a prospectus estimating that the sale area would yield a volume of 12,605 hundred cubic feet (centum cubic feet ("CCF")) or 8,345 thousand board feet ("MBF") of timber. JX 5 at 2; see also Tr. vol. 1, 118:23–119:3, 236:3–7; Tr. vol. 2, 382:11–13.[4]

The Forest Service conducted an auction in connection with the sale on October 14, 2003. JX 5 at 1. Seneca bid $117.25 per CCF, JX 8 at 1, and the Forest Service awarded it the timber sale contract on October 23, 2003, JX 9; see also JX 10 (Trapper Timber Sale Contract No. 000533, hereinafter "Trapper sale contract," "Trapper sale," or "contract").

---

[3] As Scott Keep, Seneca's director of wood procurement, explained at trial, a timber "cruise" is a survey of a harvest site in which trees are sampled and measured in an effort to assess the volume and grade of the harvestable timber. Tr. vol. 1, 80:10–13; see also id. 81:13–15 (explaining that cruisers "[m]easure every tree in that plot for height, diameter, and then assess each log segment [for] grade and potential defect"); id. 153:8–22; Tr. vol. 2, 332:23–333:2 (explaining that a cruise is "[a] very intense survey of the timber" which is aimed at determining volume).

[4] CCF is the measure of volume the Forest Service employs. See JX 4 at 1. The parties agree that 0.662 is the proper multiplier to use when converting CCF to express the volume in MBF. See Pl.'s Br. at 10–11; Def.'s Post-Trial Resp. Br. at 37 n.15, ECF No. 105; see also JX 96 at 3 (providing conversion factors for timber sales); JX 4 at 1 (Forest Service appraisal).

### III.   Intervening Litigation and Opposition to the Trapper Project

The Trapper sale contract designated 149 acres in the Willamette National Forest from which Seneca could harvest timber. JX 12 at 3; JX 2 at 22. That timber consisted primarily of mature Douglas fir trees that were an average of 140 years old. JX 2 at 46; JX 5 at 1.

Seneca began building roads and preparing to harvest the timber in 2004. JX 84 at 2. But before it began logging operations, litigation arose that ultimately resulted in the invalidation of both the 1998 FWS Biological Opinion described above and a subsequent 2005 Opinion. See JX 14 at 1–2, 22–23; JX 33; JX 32; see also Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059 (9th Cir. 2004) (invalidating September 1998 FWS Biological Opinion); Or. Nat. Res. Council v. Allan, 476 F.3d 1031 (9th Cir. 2007) (holding invalid 2005 FWS Biological Opinion that various timber sales (including Trapper) were not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of critical habitat).

As a result of litigation, logging operations were twice suspended between 2004 and 2010. JX 84 at 11 (noting that operations were suspended due to environmental litigation from March 11, 2005, to August 16, 2005, and again from June 28, 2007, to September 7, 2007); see also JX 14 at 1–2 (discussing 2005 suspension); JX 16 (discussing Gifford Pinchot Task Force, 378 F.3d 1059); JX 17 (lifting 2005 suspension). In addition, environmental groups continued to lobby the Forest Service to cancel the sale, arguing the presence of red tree voles (which had not been recorded during the original surveys) justified a new environmental analysis. JX 19 at 1 (Letter from Cascadia Wildlands); see also JX 28 at 1–3, 5 (Forest Service Memorandum describing litigation challenging sale). The Forest Service rejected these requests. JX 18 at 1; see also JX 20 at 2 (Letter from Forest Service stating that, as of 2007, "no new or additional NEPA analysis is being considered").

In 2007, as noted, the Ninth Circuit invalidated the 2005 FWS Biological Opinion the Forest Service had relied upon to establish its compliance with section 7 of the Endangered Species Act in connection with the Trapper sale and other projects. JX 21 at 9; see also JX 28 at 4 (citing Or. Nat. Res. Council, 476 F.3d 1031). At the Forest Service's request, FWS then provided a third Biological Opinion. In the updated Opinion, FWS again opined "that the implementation of [the Trapper] project at the anticipated levels would not jeopardize the continued existence of the spotted owl, nor would the project adversely modify spotted owl critical habitat." JX 21 at 1 (September 6, 2007 FWS Biological Opinion).

In the meantime, opposition to the Trapper Project continued to grow. See, e.g., JX 19 at 1 (Letter from Cascadia Wildlands); JX 28 at 5 (Forest Service memorandum describing litigation challenging sale); JX 18 (Forest Service emails describing growing opposition to the sale). In May 2010, three scientists who had been involved with the Blue River Landscape Strategy submitted comments on the Trapper Project via a letter to

the Willamette National Forest Supervisor. See JX 27; see also JX 2 at 8–12 (discussing Blue River Landscape Strategy in the Willamette National Forest). In it, they argued that, given the passage of time, the "value of anticipated lessons from going forward with logging of the Trapper Timber Sale is very low relative to what was anticipated when the sale and associated monitoring plans were developed in the 1990s." JX 27 (concluding that they "d[id] not oppose efforts to drop the Trapper Timber Sale").

A few months later, in July 2010, Seneca informed the Forest Service that it intended to begin logging operations the following month. JX 84 at 5. The parties held a pre-work meeting on July 26. JX 28 at 1. That meeting prompted the Forest Service to review information it had received since 2003 regarding the presence of red tree vole nests and spotted owls in the harvest area. See id.

The review was documented in a July 28, 2010 letter from Forest Wildlife Biologist Joe Doerr to Forest Supervisor Meg Mitchell. See JX 28 at 1. Mr. Doerr noted that, as mentioned above, red tree vole nests had been reported within the Trapper sale area in the years since the preparation of the 2003 EA. Id. at 2. He explained, however, that under the standards and guidelines in effect when the 2003 EA was completed, the Forest Service had no obligation to conduct additional surveys or take any additional action. Id.

But Mr. Doerr also observed that, on July 27, 2010, an additional pair of northern spotted owls had just been found within the Trapper Project area. Id. at 5. He advised that the Forest Service "should consider this information and decide whether or not to reinitiate consultation [with FWS]," id. at 7, which the Forest Service did that day, JX 30.

On July 29, 2010, the Forest Service suspended operations on the Trapper sale contract pending that consultation to "determine what, if any, additional protective measures will be required on the sale." JX 31 (citing contract provision BT6.25); JX 10 at 30 (BT6.25 (Protection of Threatened, Endangered, and Sensitive Species) providing that, "if new species are listed on the Endangered Species List or the Regional Forester's sensitive . . . species list," "operations will be suspended at that location until the significance or potential significance of the area is determined").

On August 30, 2010, FWS issued its fourth Biological Opinion, which was entitled "Biological Assessment for Reinitiation of Consultation for the Northern Spotted Owl." JX 34 (August 2010 Biological Opinion). In that Opinion, the FWS stated that "the removal of suitable habitat in the Trapper project may affect and is likely to adversely affect [the] northern spotted owl pair [previously identified by the Forest Service]." Id. at 25–26. It concluded, however, that "the proposed action," i.e., the timber harvest, "compl[ies] with the Record of Decision and the Standards and Guidelines of the Northwest Forest Plan . . . and the Land and Resource Management Plan of the Willamette National Forest." Id. at 8.

Thereafter, Forest Wildlife Biologist Joe Doerr conducted a supplemental information review. See JX 35 (December 14, 2010 letter from the Willamette National

Forest Supervisor to the Regional Forester, quoting results of the review). In the review, Mr. Doerr referenced a December 10, 2010 FWS Opinion (which does not appear to be in the record), and opined that the Opinion did not contain information that "significantly change[d] the effects on [the northern spotted owl] from that considered in the original 2003 Trapper Environmental Assessment, Decision Notice, and Endangered Species Act Consultation for the project." Id. at 1–2. The Forest Supervisor therefore advised the Regional Forester that "[b]ecause the project has not changed and the estimated effects to owls and red tree voles based on the 2010 analysis are of the same magnitude as determined in the original project analysis . . . no additional NEPA analysis is needed for the Trapper Timber harvest treatments with respect [to] the effects on wildlife." Id. at 4.

## IV.   The **Cascadia** Litigation

### A.   **The Cascadia Plaintiffs' Claims**

In the meantime, in October 2010, two environmental advocacy groups brought suit against the Forest Service in the United States District Court for the District of Oregon. See Cascadia Wildlands, 791 F. Supp. 2d 979. They sought to enjoin the Trapper sale, contending that the Forest Service had failed to comply with NEPA when it authorized the sale in 2003. Id. at 984–86; see also Compl. for Decl. and Inj. Relief, ¶¶ 1–4, 45–46, 57, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 1. The Cascadia plaintiffs contended that—before going ahead with the sale—the agency had an obligation to conduct a supplemental EA in response to the new information concerning the northern spotted owl and the red tree vole nests. Id. ¶¶ 4, 55, 57, 60, 62. They also relied upon the Forest Service's acknowledgement during the litigation that the statement in the 2003 EA that the Trapper sale was "not likely to adversely affect" the northern spotted owl was wrong. Pls.' Opening Mem. in Supp. of Mot. for Summ. J. at 18–19, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 19.

### B.   **The District Court's Decision**

The district court agreed with the plaintiffs and rejected arguments to the contrary offered by the Forest Service (as well as by Seneca as intervenor). See Cascadia Wildlands, 791 F. Supp. 2d at 994. It found that the "not likely to adversely affect" finding with respect to the spotted owl in the 2003 EA, which the government had acknowledged was in error, was "a cornerstone of the Trapper Project decision." Id. at 988–90. Therefore, it could not "be disregarded when considering whether subsequent information regarding adverse impacts on the species is significant or new." Id. at 988. It concluded that the Forest Service's 2010 recognition of its earlier error constituted "new and significant information," and that its "failure to prepare a supplemental EA (or [environmental impact statement]) was an abuse of discretion." Id. at 991.

The district court further observed that the Trapper Project had been "designed as a learning/research project." Id. at 993. Therefore, it held, the 2010 letter from the Blue River Landscape Strategy scientists also constituted "new information" that "call[ed] into question the learning value of the project" and that "should be evaluated as part of a supplemental EA." Id. at 991–93.

C.      **The Injunction and Seneca's Motion for Clarification**

The district court enjoined the Trapper sale on May 24, 2011, "pending the [Forest Service]'s preparation of a supplemental EA addressing the new information regarding the Northern Spotted owl and learning value of the [Trapper] project and a supplemental Decision Notice." Id. at 994. In response, on June 2, 2011, the Forest Service suspended operations on the contract pursuant to BT6.02(a)(ii). JX 42. That provision gives the Forest Service the authority to suspend or delay operations, in whole or in part, in order "[t]o comply with a court order" (among other reasons). JX 10 at 28 (BT6.02 "Interruption or Delay of Operations").

On June 20, 2011, representatives from Seneca met with the Willamette National Forest Supervisor and contracting officer ("CO") to discuss the agency's timeline and required steps for preparing the supplemental EA. JX 43. As reflected in an email the Forest Supervisor sent that day, Seneca and the Forest Service did not share a common understanding about how the Forest Service could comply with the district court's decision. Id. In the Forest Service's view, it was obligated to "updat[e] the surveys [to] meet[] today's NEPA analysis standards" and "bring the EA and corresponding decision up to today's standards." Id. On the other hand, according to the Forest Supervisor, Seneca expected only "a quick fix of the two things the [district court] asked [the Forest Service] to correct." Id.

On July 19, 2011, Seneca filed a motion for clarification of the district court's Order. Def.-Intervenor's Mot. for Clarification, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 43. It asked the district court to "clarify" that its injunction: (1) "does not require the Forest Service's supplemental NEPA analysis to start from scratch on issues either not found deficient by the Court or not challenged by plaintiffs"; and (2) "was not intended to predetermine the outcome of the supplemental NEPA process by requiring a new decision on all issues as if Trapper were a new Project." Def.-Intervenor's Mem. in Supp. of Mot. for Clarification at 1, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 44.

Seneca argued that clarification was warranted because "the law recognizes that in some situations a decision need not be revisited after NEPA supplementation." Def.-Intervenor's Mot. for Clarification at 3, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 43. Seneca urged the district court to state definitively that the Forest Service would be in compliance with its injunction if it issued a supplemental EA that only addressed the new information concerning the northern spotted owl and learning value of the Project. See id. at 2–4. It also asked the court to confirm that its order did not require the Forest Service to issue a new Decision Notice. See id. at 3.

D.      **The District's Court's Denial of Seneca's Motion for Clarification**

The government took no position on Seneca's motion for clarification. Id. at 2. The Cascadia plaintiffs, however, opposed it, see Pls.' Resp. to Intervenor's Mot. for Clarification, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 47, and, on October 4, 2011, the district court largely denied it, see Order, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 57.

The district court observed that, given that the Forest Service did not join Seneca's Motion, granting it "would require [the court] to speculate about whether and what aspects of [its injunction] may need clarification." Id. at 2. The district court also expressed reluctance to clarify its order as Seneca requested, because such a clarification "might be construed as limiting the broad discretion the Forest Service has in determining the scope of a supplemental EA." Id. at 2–3. Though it agreed with Seneca that the injunction "does not predetermine the results of the Forest Service's analysis," id. at 4, it also observed that leaving the original Decision Notice unchanged "d[id] not appear to be a viable option" for the Forest Service, in light of the fact that the original Decision Notice and FONSI were based on the erroneous "not likely to adversely affect" finding, id. at 3 n.1. Instead, the district court made clear, the Forest Service, "[u]pon completion of the supplemented or revised EA," would be obligated to "prepare a new [FONSI] which addresses the effects of the action," "[r]econsider the original decision," and "issue a new decision notice." Id. at 3 (quoting Forest Service Handbook 1909.15 (National Environmental Policy Act Handbook), Chapter 10 (Environmental Analysis), § 18.4 (Correction, Supplementation, or Revision of Environmental Documents and Reconsideration of Decisions to Take Action)).

### E.    The Supplemental Environmental Assessment

On January 5, 2012, Seneca met with representatives from the Forest Service to discuss the updated surveys the agency intended to conduct in connection with the supplemental EA. JX 47 (CO's meeting notes). At that meeting, the Forest Service advised Seneca that, "due to the amount of Red Tree Vole Nests and sensitive mollusks found throughout the sale area," and, in light of the district court's instruction "to redo the NEPA document and Decision Notice for the sale," the Forest Service anticipated modifications that would reduce the available volume of timber for harvesting by approximately two-thirds. Id.

A year later, on February 11, 2013, the Forest Service issued a notice to the public announcing its intent to prepare a revised EA for the Trapper Project. JX 50 at 1. The notice explained that, pursuant to the district court's injunction, the agency planned to prepare a "supplemental EA [to] address new information regarding the northern spotted owl [and] address the 'value of learning.'" Id. In addition, the Forest Service stated, it planned to "bring the 2003 [EA] up to date with current policy and direction." Id.

A February 14, 2013 letter to the interdisciplinary team responsible for preparing the supplemental EA similarly reflects the Forest Service's decision to go beyond revisiting the impact of the Project on the spotted owl and its learning value. See generally JX 51. McKenzie River District Ranger Terry Baker directed that he "expect[ed] the [EA] to meet current NEPA requirements, address changed conditions surrounding the Revised Trapper Project (such as the Critical Habitat Rule), address instructions from the May 2011 [injunction], and bring the 2003 [EA] up to date with current policy and direction." JX 51 at 3; see also id. at 5 (outlining the EA revision process, to include: (1) "Analysis to address court order (owl and science)"; and (2) "Analysis to meet current NEPA requirements, including changed conditions"); JX 54 at 1 (April 29, 2013 Trapper Project Interdisciplinary Meeting outlining a "Review of Work that Needs to be Done": (1) "Analysis to address court order (owl and science)"; and (2) "Analysis to meet current NEPA requirements, including changed conditions").

On April 8, 2013, the Forest Service issued a report entitled "A Supplemental Biological Assessment on the Effects of the Trapper Timber Sale of Willamette National Forest on 2012 Northern Spotted Owl Critical Habitat." JX 55 (April 2013 Biological Assessment). The April 2013 Biological Assessment, like the August 2010 Biological Opinion, "determine[ed] that the Trapper Timber Sale Project <u>may affect and is likely to adversely affect 2012 spotted owl critical habitat</u>." <u>Id.</u> at 24.

The Forest Service issued a revised EA in May 2014. JX 59 ("Revised Trapper Project Environmental Assessment," hereinafter "2014 EA" or "revised EA"). It explained that it had endeavored "to revise the 2003 environmental analysis and decision for the Trapper Project as directed by [the district court's injunction]," and to "address new information regarding the northern spotted owl, address the learning value of the project, and bring the 2003 environmental analysis up to date with current policy and direction." <u>Id.</u> at 7. The agency noted that "[s]pecific points of the [injunction]" were addressed, including: "(1) disclosure of new information that could influence effects to the northern spotted owl, and (2) the learning value of the project." <u>Id.</u> at 8; <u>see also</u> JX 61 at 1 (stating the same).

On July 12, 2014, the Forest Service issued a revised Decision Notice and FONSI. JX 61 ("Decision Notice and Finding of No Significant Impact for the Revised Trapper Project"). Based on the information outlined in the revised EA and supporting documents, the Forest Service announced, it intended to reduce the size of the Trapper sale down to thirty-three acres. <u>Id.</u> at 2. "In addition to meeting [its] contractual obligations" in preparing the supplemental EA and issuing the revised Decision Notice, the Forest Service explained, it had conducted the "court[-]ordered analysis," "updat[ed] the EA to meet current standards," and "addresse[d] the original intent of the 2003 Trapper Project purpose and need." <u>Id.</u> at 13.

The Forest Service explained that it had removed approximately six acres from the sale to protect northern spotted owl habitat. JX 58. It removed an additional eighteen acres to protect the Cascade axetail slug, <u>id.</u>, which "ha[d] been identified as a new sensitive species since 2003," JX 59 at 9. Another eighteen acres were removed because they could not "be justified as benefiting from [logging] treatment" or because removal was necessary to protect riparian reserve areas and a survey-and-manage fungus. JX 58.

The Forest Service removed the majority of the harvestable acreage from the Trapper sale—nearly eighty acres—to carve out protective buffers for red tree vole nests. <u>Id.</u> Surveys for red tree voles conducted in the years since the sale to Seneca had identified twenty-three active nests for which buffers were required under the Northwest Forest Plan's 2001 standards and guidelines for survey-and-manage species. JX 59 at 9, 39.

## F. <u>Dissolution of the District Court Injunction</u>

On August 12, 2014, the <u>Cascadia</u> plaintiffs and the government jointly filed a stipulated motion requesting dissolution of the district court's May 2011 injunction. <u>See</u> Stip. Mot. to Dissolve Inj., <u>Cascadia Wildlands</u>, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 71.

The parties represented to the district court that the "Forest Service ha[d] completed a revised EA to address [its] injunction, and on July 12, 2014, the agency issued a Decision Notice authorizing a revised Trapper project," which it "plan[ned] to implement . . . in the near future." Id. at 2. The district court granted the motion and dissolved the injunction the following day. See Order, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 73.

## V.    Settlement Discussions Regarding Partial Termination

In the meantime, on July 30, 2014, Contracting Officer Justin Burkey notified Seneca that the revised Decision Notice had been issued, and that the Forest Service "ha[d] started the required fieldwork to implement . . . the decision." JX 62. Because the Forest Service anticipated "completing the fieldwork by October 2014," he continued, the agency sought a September meeting with Seneca "to review the changes under the Revised Trapper decision" and "discuss the modification of the sale and the changed conditions and requirements as it pertains to the contract." Id.

It is unclear from the record whether a meeting was held with Seneca in September. At the end of the month, however, on September 30, 2014, the Regional Forester requested that the Chief of the Forest Service exercise his authority to "partially terminate the Trapper timber sale pursuant to contract provision CT8.24." JX 69 at 1. That provision states that the Chief of the Forest Service may, "by written notice . . . terminate this contract, in whole or in part," for any of the following reasons:

> (a) To comply with a court order, regardless of whether this timber sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this timber sale or
> (b) Upon a determination by the Chief that the continuation of all or part of the contract would:
>> (i) Cause serious environmental degradation or resource damage;
>> (ii) Be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;
>> (iii) Cause serious damage to cultural resources pursuant to BT6.24;
>> (iv) Cause serious damage to cave resources pursuant to BT6.26; or
>> (v) Adversely affect species listed as threatened or endangered under the Endangered Species Act, 16 USC 1531, et seq., or a sensitive specifies identified by the Regional Forester pursuant to BT6.25.

JX 10 at 108 (hereinafter "provision CT8.24" or "CT8.24").

The district court's injunction, the Regional Forester noted, "required the Forest Service to incorporate updated northern spotted owl information and address the 'learning value' that was part of the rationale for the [Trapper] project." JX 69 at 2. The culmination of that effort, he observed, was the supplemental 2014 EA and revised Decision Notice, the implementation of which would result in the removal of acreage "impacted by northern spotted owls (threatened) and axtail slugs (sensitive)." Id. at 3. Also to be removed was acreage needed to protect red tree

vole nests, "riparian areas, and portions that are infeasible to log based on the new unit configuration." Id.

The Regional Forester proposed that twenty-four acres be deleted from the contract pursuant to CT8.24(b)(v), id., i.e., the threatened, endangered, or sensitive species provision, JX 10 at 108. He also requested that ninety-eight acres be deleted pursuant to CT8.24(b)(i) and (ii), JX 69 at 3, i.e., the "environmental degradation or resource damage" provisions, JX 10 at 108.

On December 17, 2014, the Director of Forest Management, on behalf of the Chief of the Forest Service, declined to issue the formal partial termination determination the Regional Forester had requested. See JX 73. Instead of unilaterally directing a partial termination, he instructed the Regional Forester to try to work out the terms of the partial termination with Seneca and memorialize it in a settlement agreement. Id. at 1.

To those ends, CO Burkey met with Seneca on January 21, 2015. JX 77. He presented a "proposed modification package for the Trapper Timber Sale," and subsequently provided "follow up information on the sensitive, threatened and endangered species that have affected the sale." Id. Over the course of the next few months, Seneca and Forest Service officials (including the CO) exchanged emails discussing potential recovery under the contractual termination provisions. See JXs 75, 76.

On August 6, 2015, CO Burkey requested that Seneca agree to a schedule that would allow the parties to reach an agreement by September 30, 2015. JX 77. He warned that the Forest Service would "proceed with a unilateral modification of the Trapper Timber Sale" if it did not receive a response from Seneca by that date. Id.

## VI.  Seneca's Certified Claim

On August 18, 2015, Seneca filed a fourteen-page certified claim addressed to CO Burkey, in which it declared that the Forest Service was in material breach of the Trapper contract. See JX 78 (certified claim). Seneca characterized the breach as arising out of the "permanent refusal" of the Forest Service "to allow Seneca to exercise its contractual right to operate and complete the Trapper Timber Sale Contract." Id. at 6.[5] Seneca argued that the Forest Service had violated the implied duty of good faith and fair dealing when it negligently stated in the 2003 EA that the sale would likely have no significant impact on the spotted owl. Id. at 8–9. That error, Seneca argued, along with the supposed "willful misconduct" of the Forest Service scientists who publicly criticized the continuation of the project, each played a part in the district court's decision to issue the injunction in Cascadia. Id. According to Seneca, the Forest Service could be held liable for breach of contract "if its own unreasonable or wrongful actions caused

---

[5] In the claim letter, Seneca stated that the breach "occurred at a date between November 2013 and March 17, 2014 that is currently unknown to Seneca and appears at this time to be November 4, 2013." JX 78 at 1. Elsewhere in its claim letter, Seneca states that on that date (November 4, 2013) the parties held a meeting on the revised EA and that a Forest Service representative told Seneca that the revised Trapper Project would be reduced to thirty-six acres. Id. at 5.

the court order [suspending a timber sale] to be imposed in the first place." Id. at 8 (quoting H.N. Wood Prods. v. United States, 59 Fed. Cl. 479, 487 (2003)).

Seneca also sought to neutralize the impact of the contract's partial termination provisions on its breach-of-contract claims. It asserted that—because it had already declared that the Forest Service was in material breach—it was too late for the Forest Service to invoke those provisions. Id. at 7–8. Seneca advised the CO that it was discontinuing its performance on the contract but that it would be willing to perform under the revised Trapper Project to mitigate its losses. Id. at 1. It appended to its claim a worksheet setting forth its calculation of its damages for breach of contract, including lost profits and out-of-pocket expenses, id. at 12–13, which it estimated to be $4,440,369, id. at 18.

## VII.   The May 9, 2016 Contracting Officer's Final Decision and Partial Termination of the Contract

On April 8, 2016, some seven to eight months after Seneca filed its certified claim, the Regional Forester again requested that the Chief of the Forest Service "partially terminate the Trapper timber sale pursuant to contract provision CT8.24." JX 81 at 1. This time, however, he proposed that the termination be effected under paragraph (a), id. at 2, which states in pertinent part that the Chief of the Forest Service, "by written notice, may terminate this contract, in whole or in part," "[t]o comply with a court order, regardless of whether this timber sale is named in such an order, upon determination that the order would be applicable to the conditions existing on this timber sale," JX 10 at 108 (CT8.24(a)).

On May 9, 2016, the Acting Director of Forest Management approved the request for partial termination on behalf of the Chief of the Forest Service. JX 83 at 2. He stated that— effective that day—the Forest Service was cancelling Seneca's right to harvest all but twenty-seven acres available under the original Trapper sale pursuant to provision CT8.24(a). Id. Accordingly, he observed, Seneca would receive compensation calculated under CT9.53. Id. at 1.

On that same day, CO Burkey issued a final decision denying in substantial part Seneca's certified claim. JX 84 (Contracting Officer's Notice of Final Decision ("COFD")). He rejected Seneca's argument that the Forest Service had breached the contract by preventing it from harvesting the acreage included in the contract. Id. at 15. He found that the terms of the contract authorized the Forest Service to impose each of the suspensions of performance about which Seneca complained in its claim letter. Id. at 10–11, 13. He also noted that the result of the EA district court had ordered was a reduction in the acreage in the Trapper sale and that, since the injunction had been dissolved, the Forest Service had attempted to reach an agreement to modify the contract under CT8.24. Id. at 12–13. Therefore, he stated, while Seneca could not harvest the total estimated volume of the sale that was originally awarded, the Forest Service's actions were consistent with the contract. Id. at 15.

On May 12, 2016, the Forest Service unilaterally modified the contract to reflect the changes required under the COFD and the decision of the Acting Director of Forest Management. JX 85. In addition, and consistent with the COFD, see JX 84 at 15, the CO advised Seneca that it was entitled to recover its out-of-pocket expenses in the amount of $141,327.98,

plus $5,578.20 in interest, JX 85; see also JX 86 at 1 (CO's May 12, 2016 letter stating that "execution of the required modification has occurred and that operations on the Trapper Timber Sale can resume").

## VIII.   Performance of the Modified Contract

On March 10, 2017, Seneca emailed CO Marc Dasher, posing questions about the revised contract. JX 87. He explained that, in the Forest Service's view, "the contract remains in effect" and had not been breached, and that therefore "Seneca remains obligated to complete it." JX 88 at 1.

Seneca harvested timber from seven of the twenty-seven-acre revised sale in 2017, exclusively via helicopter logging. Tr. vol. 1, 61:12–22, 62:20–23. It harvested the remaining twenty acres in 2018, employing cable logging and ground-based logging methods. Id. 62:24–63:4. The contract was closed on March 23, 2020. JX 100.

## IX.   The Present Case

### A.   Complaints and Dispositive Motions

In the meantime, on August 12, 2016, several months after the CO rejected its claim and the Forest Service partially terminated the contract, Seneca filed the present action. See Compl., ECF No. 1. In its complaint, it alleged breach of contract and requested an award of damages totaling $4,440,369. Id. ¶ 23.

On October 14, 2016, the government filed a motion to dismiss Seneca's complaint under RCFC 12(b)(6), Def.'s Mot. to Dismiss, ECF No. 6, which the Court denied on March 29, 2017, Op. and Order at 6, ECF No. 15. Seneca filed a motion to amend its complaint, Pl.'s Mot. to File First Am. Compl., ECF No. 33, which the Court granted on November 2, 2018, Order, ECF No. 36.

Seneca filed its amended complaint on November 2, 2018. See First Am. Compl., ECF No. 37. In it, Seneca alleged that the Forest Service breached the Trapper contract by electing to "prepar[e] an entirely new environmental assessment" in response to the district court's injunction, rather than "the supplemental environmental assessment called for in the [district] Court's Order." Id. ¶ 12. In addition, Seneca challenged the Forest Service's decision to terminate the contract under CT8.24(a), alleging that "the Forest Service breached its contractual obligation set out in contract provisions CT8.24 and CT9.53 not to modify or terminate a timber sale contract to comply with a court order unless the contracting officer made a determination that the modification or termination was 'necessary for correction of the deficiencies raised by the appeal or lawsuit.'" Id. ¶ 13.

A period of discovery followed, after which the government filed a motion for summary judgment on July 25, 2019. Def.'s Mot. for Summ. J., ECF No. 47. The Court granted the motion in part on July 2, 2020. Seneca I, 149 Fed. Cl. 83. It agreed that the government was entitled to summary judgment as to Seneca's claim based on the duty of good faith and fair dealing, id. at

101–03, but rejected the balance of the government's arguments as to Seneca's breach-of-contract claims, id. at 95–101.

The Court explained that the Forest Service may have erred when it invoked CT8.24(a) to partially terminate the Trapper contract because the district court's order did not require cancellation of the contract; it merely directed the Forest Service to conduct a supplemental EA and then decide for itself what action to take. Id. at 99–100. It observed, however, "that even if Seneca ultimately demonstrates that CT8.24(a) did not justify the partial termination of the contract, the government may be able to rely upon the doctrine of constructive termination by establishing that it could have invoked any of the grounds for termination set forth in CT8.24(b)." Id. at 96.

## B. **The Trial**

The Court held a two-day trial on Seneca's breach-of-contract claim on November 1 and 2, 2021. At trial, Seneca alleged that it is entitled to an additional $66,208.16 in uncompensated out-of-pocket costs (pursuant to contract provisions CT9.51, CT9.52(b), or CT9.53). Pl.'s Br. at 22. It also alleged that the Forest Service breached the Trapper contract by invoking CT8.24(a) instead of CT8.24(b) and argued that it is entitled to relief for the value of the deleted timber in the amount of either $1,775,243 or $2,757,706. Id. at 23–25.

In support of its claims, Seneca presented the testimony of Todd Payne, its President and CEO; Carl Harrison, its logging manager; Scott Keep, its director of wood procurement; Brian Carlin, its Senior Vice President and Chief Financial Officer; William Roach, a consulting forester; and Paul Beck, who, at the time of trial, was the Chief Executive Officer of the Mountain Western Log Scaling and Grading Bureau.

Two witnesses testified for the government: Thomas Rudisill, the Forest Service's timber program manager and silviculturist for the Willamette National Forest; and David Bishop, the Forest Service's pre-sale forester for the McKenzie River Ranger District within the Willamette National Forest.

The parties filed post-trial briefs in the case on December 20, 2021, see id., February 2, 2022, see Def.'s Post-Trial Resp. Br. ("Def.'s Resp."), ECF No. 105, and March 4, 2022, see Pl.'s Post-Trial Reply Br. ("Pl.'s Reply"), ECF No. 108. The Court heard closing arguments on June 23, 2022.

## DISCUSSION

## I. **Jurisdiction**

The first issue before the Court is whether it has jurisdiction over Seneca's claims under the Contract Disputes Act ("CDA"). See 28 U.S.C. § 1491(a)(2) (granting the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract . . . and other nonmonetary disputes on which a decision of the

contracting officer has been issued"). "The CDA mandates that '[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.'" Tolliver Grp., Inc. v. United States, 20 F.4th 771, 775 (Fed. Cir. 2021) (quoting 41 U.S.C. § 7103(a)(1)). Therefore, "obtaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim in" this court. Id. at 775–76 (citing 41 U.S.C. §§ 7104(b)(1), 7103(g); Raytheon Co. v. United States, 747 F.3d 1341, 1354 (Fed. Cir. 2014)); see also M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1328 (Fed. Cir. 2010) ("[F]or the Court of Federal Claims to have jurisdiction under the CDA, the contractor must submit a proper claim—a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision." (citing Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996))). "The purpose of the requirement is 'to create opportunities for informal dispute resolution at the contracting officer level and to provide . . . clear notice as to the' content of 'contract claims.'" Tolliver Grp., Inc., 20 F.4th at 776 (quoting Raytheon, 747 F.3d at 1354).

The government contends that the Court lacks jurisdiction to determine whether Seneca is due any relief under the contract's termination provisions because, in its August 2015 request for a contracting officer's final decision, Seneca pressed only a breach-of-contract claim and sought damages based solely on that claim. See Def.'s Resp. at 15–19. Therefore, according to the government, the Court lacks jurisdiction to consider the questions before it now: whether the Forest Service properly invoked CT8.24(a) when it partially terminated the Trapper sale and, if not, whether it could have instead invoked CT8.24(b). Id.

The government's position lacks merit. The standard requiring that an action before this court be based on the "same claim" as the one presented to the contracting officer "does not require ridged adherence to the exact language or structure of the original administrative CDA claim." Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003). The Court may exercise its jurisdiction where the claims "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." Id.

As described above, in its certified claim, Seneca alleged that—when the Forest Service decided to partially cancel the Trapper sale as a result of the findings in its supplemental EA— the agency breached its obligations under the timber sale contract; in particular, its implied duty of good faith and fair dealing. See JX 78 at 6–11 (certified claim). Seneca also challenged the Forest Service's right to invoke the contract's partial termination provisions, arguing that, in light of the alleged material breach, it was too late to do so. Id. at 7–8.

The CO, who had for months been involved in efforts to settle the dispute with Seneca, rejected both claims. See JX 84 (COFD). He denied the breach-of-contract claim on the grounds that reduction in the acreage covered by the sale was governed by the partial termination provisions. Id. at 10–13. Therefore, he found, Seneca could not recover damages on the basis of breach of contract. Id. Instead, the agency partially terminated the contract under CT8.24(a), and the CO determined that Seneca was due only the compensation awardable under the contract itself, which was $141,327.98 in out-of-pocket expenses. Id. at 14–15.

When the case came to this Court, Seneca similarly pressed a breach-of-contract claim, again including a claim that the Forest Service breached its implied obligation of good faith and fair dealing. First Am. Compl. ¶ 11; id. ¶ 13 (asserting that "the Forest Service breached its implied duty to cooperate and not to hinder performance of plaintiff's timber sale contract"). It also argued, as it had before the CO, that the Forest Service could not invoke CT8.24(a) to avoid liability for damages based on breach of contract. Id. ¶ 13.

To be sure, in challenging before this Court the CO's authority to invoke the partial termination provision, Seneca relied upon a different legal theory than the one it articulated in its certified claim.[6] Nonetheless, the claims before the CO were based on essentially the same operative facts, namely, the Forest Service's decisions: (1) to expand the supplemental EA to cover matters allegedly not required by the district court's decision, JX 78 at 4–5, 12; First Am. Compl. ¶¶ 13, 18; and (2) not to allow Seneca to harvest timber on all the acreage covered by the contract but to instead partially terminate the contract under CT8.24, JX 78 at 7–8; First Am. Compl. ¶¶ 17, 19.

There is similarly no merit to the government's argument that the Court lacks jurisdiction to award relief on the basis of the remedial provisions available under CT8.24(b). Def.'s Resp. at 18–19. The Court agrees that this question was not presented to or considered by the CO. But the argument that CT8.24(b) applies is part of the government's defense against Seneca's breach-of-contract claims. See Rsrv. Ranch v. United States, 39 Fed. Cl. 696, 719 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) ("It is settled law that where the government has canceled a contract based upon erroneous grounds, the cancellation may be sustained if there existed an adequate ground for cancellation at the time of cancellation, even if the ground was not then known.") (collecting cases). Given the Court's determination (explained below) that CT8.24(a) was not properly invoked, the Court would have to find the government in breach of contract if it were not able to consider whether the Forest Service could have instead relied on CT8.24(b).

In short, the government's jurisdictional arguments lack merit. The Court turns, therefore, to the question of whether the agency properly invoked CT8.24(a) as the basis for partial termination of the contract.

## II.    The Invocation of CT8.24(a) to Terminate the Trapper Contract

The Forest Service relied upon CT8.24(a) as the basis for its partial termination of the Trapper contract. JX 83 at 1. As noted above, that provision states, in pertinent part, that the

---

[6] Specifically, Seneca alleged in its complaint that, under CT9.53, the CO was required to independently determine what changes in the contract were required to correct the deficiencies that the district court identified in Cascadia Wildlands. First Am. Compl. ¶ 13. Because he had not done so, Seneca contended, the Forest Service could not invoke CT8.24(a). Id. This Court rejected that argument in ruling on the motion for summary judgment, holding that, under CT8.24, it was the job of the Chief of the Forest Service to determine the scope of the actions needed to comply with the Court order or with NEPA. Seneca I, 149 Fed. Cl. at 99 (observing that "CT8.24(a) states in pertinent part that the Chief of the Forest Service may terminate the contract in whole or in part '[t]o comply with a court order'").

Chief of the Forest Service may terminate the contract in whole or in part "[t]o comply with a court order." JX 10 at 108.

CT8.24(a) does not apply to the partial termination of the Trapper sale because the district court did not direct that the contract be terminated in whole or in part. More to the point, the district court did not require the Forest Service to remove acreage from the sale, nor did it determine how much and which acreage to remove. It was the Forest Service that made those decisions, after it prepared a supplemental EA as the district court had ordered. The Forest Service achieved compliance with the district court's order when it considered new information regarding the northern spotted owl and the learning value of the Trapper Project and prepared a supplemental EA and new Decision Notice based on its review of that information.

Further, the district court explicitly recognized the possibility that "the Forest Service, after preparing a supplemental EA, [might] make[] the Decision to go forward with Trapper." Cascadia Wildlands, 791 F. Supp. 2d at 994. And, in denying Seneca's motion for clarification, the district court reiterated that its injunction "d[id] not predetermine the results of the Forest Service's analysis." Order at 4, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 57.

Moreover, it was the Forest Service that decided to expand the scope of the supplemental EA beyond the particular areas of concern the district court identified. The Forest Service publicly stated that the purposes of its revised environmental assessment were "to disclose effects of harvesting timber already sold under contract, and to respond to analysis deficiencies identified by the [injunction]." JX 50 at 2 (emphasis added); see also JX 51 at 3 (explaining that the revised EA would "address instructions from the May 2011 [injunction], and bring the 2003 environmental analysis up to date with current policy and direction") (emphasis added); JX 51 at 5 (outlining the EA revision process, which included: (1) "Analysis to address court order (owl and science)"; and (2) "Analysis to meet current NEPA requirements, including changed conditions"); JX 54 at 1 (April 29, 2013 Trapper Project Interdisciplinary Meeting outlining "Work that Needs to be Done": (1) "Analysis to address court order (owl and science)"; and (2) "Analysis to meet current NEPA requirements, including changed conditions"); JX 59 at 7, JX 61 at 1 (all stating that the Forest Service aimed to revise its 2003 EA by bringing the environmental analysis up to date with current policy).

In its Post-Trial Response Brief, the government argues that "even if the acreage reductions at issue here were not required in response to the district court's 2011 injunction order, they were certainly required in response to that court's 2014 minute order dissolving the injunction." Def.'s Resp. at 27. It so contends because the decision to dissolve the injunction "was based on the representation that the Forest Service planned to implement the revised environmental assessment and decision notice." Id. This argument is likewise unpersuasive.

The district court did not say why it was dissolving the injunction. Presumably, it lifted the injunction because the parties requested that it do so in the wake of the Forest Service's completion of "a revised EA to address [the] Court's injunction" and its issuance of a Supplemental Decision Notice. Stip. Mot. to Dissolve Inj. at 2, Cascadia Wildlands, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 71. The government's argument that—by lifting its injunction

18

against performance on the contract—the district court somehow also compelled the partial termination the Forest Service implemented is illogical.

For these reasons, this case is not at all like <u>Scott Timber Co. v. United States</u>, as the government argues. Def.'s Resp. at 26 (citing 692 F.3d 1365, 1373–74 (Fed. Cir. 2012)). In that case, after a district court issued a preliminary injunction suspending certain timber sales in the context of environmental litigation, the Forest Service entered a settlement agreement with the plaintiffs. <u>Scott Timber</u>, 692 F.3d at 1369–70. In the settlement, the Forest Service agreed to continue the suspension of operations until it completed certain wildlife surveys. <u>Id.</u> at 1370. The district court entered the agreement as a formal order in the case, and dismissed the complaint, subject to reinstatement in the event of a material breach of the settlement. <u>Id.</u>

The plaintiff in <u>Scott Timber</u> contended that the suspension was undertaken to comply with the settlement agreement and was not necessary "to comply with a court order." <u>Id.</u> at 1373. The Federal Circuit rejected this argument. <u>Id.</u> It noted that the district court had specifically ordered the parties to comply with the settlement agreement (which included the suspension of the sale). <u>Id.</u> at 1374. In addition, the district court's order contemplated that if the Forest Service did not perform the surveys required by the settlement, it would enter an order enforcing the agreement. <u>Id.</u> "In this light," the court of appeals observed, "it is clear that the agreement was the equivalent of a 'court order' within the suspension clause of the contracts." <u>Id.</u>

By contrast, in <u>Cascadia Wildlands</u>, the district court entered a judgment on the docket that <u>vacated</u> its order suspending the timber sale. <u>See</u> Docket, <u>Cascadia Wildlands</u>, 791 F. Supp. 2d 979 (No. 10-6337), ECF No. 73. It did not order cancellation of the contract by, for example, mandating compliance with the Decision Notice. The Court concludes, therefore, that the partial termination was not necessary "to comply with a court order," and that CT8.24(a) did not provide the Forest Service with the authority to impose such a termination.

## III.    Damages Under CT8.24(b)

For the reasons set forth above, the Court has concluded that CT8.24(a) did not authorize the Forest Service's partial termination of the Trapper timber sale. The parties have stipulated, however, that if the Court were to find that the Forest Service could not rely on CT8.24(a), it could have proceeded under CT8.24(b)(i), (b)(ii), and/or (b)(v). Therefore, the government is entitled to rely upon the doctrine of constructive termination to limit Seneca's relief to that which the contract provides for terminations under those provisions.

The dispute before the Court concerns what that relief would be. Provision CT9.52 applies to terminations under CT8.24(b)(i) and (b)(ii). JX 10 at 108 (explaining that "compensation for termination under paragraphs (b)(i) through (b)(iv) shall be calculated pursuant to CT9.52"). That provision states that the contractor's compensation will consist of "[t]he difference between Current Contract Rates for the remaining uncut volume and the rates paid for comparable timber on the same National Forest during the preceding 6-month period multiplied by the remaining uncut volume." <u>Id.</u> at 111 Terminations under CT8.24(b)(v), however, are subject to CT9.51, <u>id.</u> at 108 (explaining that "compensation for termination under

paragraph (b)(v) shall be calculated pursuant to CT9.51"), which limits relief to out-of-pocket expenses, id. at 111 (CT9.51).

A threshold dispute concerns what volume of the timber which was terminated could have been cancelled under CT8.24(b)(i) or (ii) (i.e., to avoid environmental degradation or because the harvest would be inconsistent with forest plans), and how much could have been terminated under CT8.24(b)(v) (i.e., to protect threatened and endangered species).[7] Another dispute concerns how "uncut volume" should be determined for purposes of calculating compensation under CT9.52.[8] The parties also take conflicting positions regarding the "current contract rate" to use for relief under CT9.52, with Seneca arguing that the appropriate rate is $112.01 per MBF, Pl.'s Br. at 10–11; Pl.'s Reply at 9, and the government contending that it should be $225.32 per MBF, Def.'s Resp. at 37.[9]

While these disagreements were the focus of much of the testimony and evidence adduced at trial, the Court finds it unnecessary to resolve them. Seneca is not entitled to further recovery under CT9.52 because it has not persuaded the Court that "the rates paid for comparable timber on the same national forest" during the six-month period that preceded the partial termination were higher than the then-current contract rates. This is so even if, as Seneca contends, current contract rates were $112.01 per MBF.

A.      **Seneca's Burden**

The parties agree, and the Court finds, that there was no comparable timber purchased on the Willamette National Forest during the six-month period preceding the partial termination of

---

[7] The government argues that 48 of the 122 cancelled acres could have been terminated under CT8.24(b)(v) (to protect the northern spotted owl and the Cascade axetail slug), with the remaining 74 acres cancelled under either (b)(i) or (b)(ii). See Def.'s Resp. at 42. Seneca, on the other hand, argues that only 24 acres could have been removed under CT8.24(b)(v) with the remaining 98 acres removed under either (b)(i) or (b)(ii). See Pl.'s Br. at 12–13; Pl.'s Reply at 6.

[8] The government contends that "uncut volume" is measured by the volume identified in the contract. Tr. vol. 1, 156:5–23 (arguing that "the contract number is what controls" (citing JX 12 at 3)); Def.'s Resp. at 42–43. Seneca contends that "uncut volume" means the actual volume of timber on the deleted acres, Pl.'s Br. at 15, and argues that the Court should approve the calculation of the uncut volume set forth in a timber cruise performed in 2014 by Jackson and Prochnau at Seneca's request, id. at 15–19; Pl.'s Reply at 8.

[9] The difference is based on whether or not the contract rate should incorporate the Emergency Rate Reduction the government agreed to provide purchasers in July 2009 in the wake of the so-called "great recession." See JX 98 (contract rates); JX 23 (Seneca's June 4, 2009 request for an Emergency Rate Reduction). The government argues that Seneca cannot rely on the reduced rate because in the contract modification that established the reduced rates Seneca agreed "to release the United States (acting by and through the U.S. Forest Service) from all liability, including further consideration or compensation, resulting from this modification." Def.'s Resp. at 41 (quoting JX 25 at 2 (July 29, 2009 agreement to modify Trapper contract)).

the Trapper contract on May 9, 2016. See Pl.'s Br. at 12–13; Def.'s Resp. at 39; see also Tr. vol. 1, 240:24–241:6, 265:5–12 (testimony of Seneca witness Paul Beck); Tr. vol. 2, 372:24–373:13 (testimony of government expert witness David Bishop). Therefore, the parties agree, a reasonable method for computing the compensation due to Seneca would be to determine the difference between the then-current contract rates during that period and the rate a reasonable purchaser would have been willing to pay for comparable timber had such timber been put on sale. But the parties differ sharply as to the latter. Seneca argues that the rate for comparable timber in the six months preceding the partial termination would have been $584.22 per MBF, Pl.'s Br. at 21, 24, while the government argues that the rate would have been much lower, at $73.21 per MBF, Def.'s Resp. at 38–40.

As plaintiff, it is Seneca's burden to establish its entitlement to damages. Northrop Grumman Computing Sys., Inc. v. United States, 823 F.3d 1364, 1368 (Fed. Cir. 2016) ("It is fundamental in contract law that in order to recover on a breach of contract claim, a plaintiff must prove damages—that it has been harmed." (citing Restatement (Second) of Contracts § 346 (Am. L. Inst. 1981))). It is also "incumbent upon [the plaintiff] to establish a reasonable method for computing the requested compensation." Daly Const., Inc. v. Garrett, 5 F.3d 520, 522 (Fed. Cir. 2019); see also Sonoma Apartment Assocs. v. United States, 939 F.3d 1293, 1299 (Fed. Cir. 2019) ("Plaintiffs must provide some measure of substantiation to show the reasonableness of their calculations."). And the evidence a plaintiff submits must support the calculation of those damages to a "reasonable certainty." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)); see also Restatement (Second) of Contracts § 352 (Am. L. Inst. 1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

For the reasons set forth below, Seneca has not shown that the rate that it would have had to pay for comparable timber in 2016 was greater than the then-current contract rate for the Trapper logs, and if so, by how much. It has therefore failed to establish its entitlement to additional damages under CT9.52.

## B.     The Opinion of Paul Beck

Seneca relied largely on the testimony of Paul Beck to support its argument that a reasonable purchaser would have paid $584.22 per MBF for comparable timber in the six months before the partial termination of the contract. Mr. Beck is the outgoing CEO of the Mountain Western Log Scaling and Grading Bureau, Tr. vol. 1, 188:14–17, and has decades of experience as a log scaler and buyer, id. 188:20–190:4. He has substantial experience bidding on Forest Service and other public timber sales, including those that contain high-grade logs like those available under the Trapper sale. Id. 189:18–24, 201:12–18, 203:17–24, 204:16–23, 215:17–19.[10]

---

[10] Although Seneca has characterized Mr. Beck as an expert in timber appraisal, Pl.'s Br. at 5, 15, 19–21, and Mr. Beck prepared several "expert" reports in connection with this case to which he referred during his testimony, Tr. vol. 1, 212:9–17, 259:23–24; see also id. 5:10–13, Seneca did not ask the Court to qualify Mr. Beck as such at trial.

Seneca tasked Mr. Beck with performing an appraisal of the 98 acres of timber that it contends the Forest Service could have removed from the Trapper sale pursuant to CT8.24(b)(i) and/or (b)(ii). Id. 212:18–22; see also id. 232:18–233:4, 249:19–250:5. The first step of such an appraisal, he explained, is to perform a timber cruise to determine the volume of the uncut timber and, "more importantly," its quality, so that he could value the timber on a per thousand board feet basis. Id. 214:8–13. Based on the timber cruise Jackson and Prochnau performed at Seneca's request in 2014, id. 218:20–25, he opined that 6.11 million board feet of timber could have been harvested on the deleted 98 acres, id. 218:8–12, 235:4–18, 263:11–17. Mr. Beck next estimated the "pond value" of the timber based on its volume and quality. Id. 214:13–18. The "pond value," Mr. Beck explained, is the amount that the timber is worth after it is harvested and delivered to the mill. Id. 214:15–18; see also id. 216:14–17 (testifying that the pond value is "the value of [a] log delivered to its final destination, the mill"). Mr. Beck chose to appraise the timber to the highest market. Id. 229:13–14. He assumed, therefore, that the winning bidder for a sale which took place in the six months before May 2016 would have expected to sell all of the Douglas fir harvested from the deleted acres to specialty cutting mills willing to pay a premium on high-grade logs for their aesthetic value. Id. 229:23–25 (testifying that Seneca would not have processed a single log in its own facilities); see also Pl.'s Br. at 20 ("As Mr. Beck explained at trial, had the 98 acres removed from the Trapper timber sale been rebid in the first quarter of 2016 as a stand-alone timber sale, virtually all of the Douglas fir volume would have been delivered to area cutting mills.").

Mr. Beck valued the Douglas fir on the basis of the prices contained in a July 1, 2018 log purchase agreement between Seneca and Herbert Lumber, an old-growth mill to which Seneca frequently sold high-grade logs it opted not to process in its own facilities. Tr. vol. 1, 211:20–212:8 (citing JX 92 (2018 Herbert Lumber log purchase agreement)); Pl.'s Br. at 20. He valued the remaining timber, consisting of Cedar and Hemlock, on the basis of the Log Lines index. See Pl.'s Br. at 20, 24; see also JX 101 (Log Lines 2003–2018 report for Region 3).[11] His analysis yielded an estimated pond value of $5.83 million for all of the remaining uncut timber. Tr. vol. 1, 263:21–25.

Next, Mr. Beck estimated the cost of harvesting and delivering the timber, which he calculated at just over $2 million, or $289.15 per MBF. Id. 216:18–217:8; see also id. 249:14–15 (referencing JX 105 at 12); id. 258:19–259:3 (referencing JX 105 at 8). This total included logging costs, id. 214:19–215:10, 216:18–20, the cost of constructing roads, id. 214:23–25, 217:6–7, the cost to deliver logs via truck to the appropriate mill, id. 214:25–215:5, 216:24–215:1, and the cost of disposing of "the nonmerchantable material, limbs, [and] chunks that [are] burnt at the end of the timber sale," id. 217:3–5.

---

[11] Mr. Beck did not use the Log Lines index for the Douglas fir because, he explained, Log Lines blends the prices of high-grade logs with those of commodity logs (which are 95% of the total market). Tr. vol. 1, 206:12–18, 206:23–207:1. He opined that Log Lines shows the trend in commodity logs and, he said, "those coarse grain logs" have "absolutely no relevance to the high-quality cutting mill-type logs." Id. 206:17–20.

Using these figures, Mr. Beck determined that the residual value of the uncut volume of timber (i.e., pond value minus costs) was $3,785,085. Id. 249:2 (referencing JX 105 at 5); see also Def.'s Resp. at 32 (referencing JX 105 at 5). According to Mr. Beck, this figure represented "the value of [the] trees on . . . the stump," or, in other words, what the "stand of [deleted] timber was worth." Tr. vol. 1, 217:10–13; id. 250:15–16 ("It would have sold for $3.7 million."); id. 274:21–24 ("[W]ould you have been prepared to bid the $3.7 million in residual value that your appraisal shows for that 98-acre timber sale? A. At least.").

In its Post-Trial Brief, Seneca acknowledges that Mr. Beck made several errors when he calculated the residual value of the uncut volume of timber during the six-month period before May 9, 2016. See Pl.'s Br. at 18–21, 24. First, Seneca observes, he miscalculated the uncut volume that remained after the partial termination because he failed to account for the timber that was removed under CT8.24(b)(v) rather than (b)(i) or (b)(ii). Id. at 18–19. With this error corrected, Seneca asserts, the remaining uncut volume was 5,840 MBF (rather than 6,110 MBF). Id.

Second, Mr. Beck's error regarding the remaining uncut volume also caused him to overstate the pond value of the deleted timber. Id. at 20. As corrected, Seneca asserts, the "pond value" for the remaining uncut volume of 5,840 MBF is $5,464,511 (rather than $5.83 million). Id.

Finally, Seneca observes that two components of Mr. Beck's cost of performance calculation must be adjusted. Id. at 21. First, when the uncut volume is corrected and multiplied by Mr. Beck's logging cost figure of $289.15 per MBF, the logging costs are reduced from $1,769,869 to $1,691,673. Id. Second, Seneca acknowledges, Mr. Beck overstated the road construction costs. Id. Those costs should have been $183,229, or 64.75% of $278,676, id. (citing JX 80 (List of Changes for Contract Modification) and referencing JX 105 at 12), rather than the $238,257.85 to which Mr. Beck testified at trial, Tr. vol. 1, 135:9–12. With those adjustments, Seneca argues, the total cost of performing the timber harvest of the remaining uncut volume would be $2,052,686. Pl.'s Br. at 21.

Adopting these adjusted figures, Seneca argues in its Post-Trial Brief that the residual value of the uncut timber was $3,411,825, id., rather than $3,785,085, as Mr. Beck had testified, Tr. vol. 1, 249:2; Def.'s Resp. at 32. Seneca also used the adjusted figures to calculate the dollar rate that would have been paid for comparable timber, see Pl.'s Br. at 21 (citing Pl.'s Br. Ex. A, at 1, ECF No. 102-1), a task Mr. Beck did not perform, Tr. vol. 1, 241:2–23. Seneca explains that it divided the revised residual value ($3,411,825) by the volume of deleted timber (5,840 MBF), yielding a 2016 bid rate of $584.22 per MBF. Pl.'s Br. at 21 (citing Pl.'s Br. Ex. A, at 1). The difference between that rate and what Seneca argues was the then-current contract rate ($112 per MBF) is $472.21 per MBF. Id. And when that difference is multiplied by the remaining uncut volume, Seneca argues, it is due $2,757,706 in compensation under CT 9.52. Id. at 23–24 (citing Pl.'s Br. Ex. A at 1).

23

C.    **Flaws in Mr. Beck's Methodology**

1.    **Appraising to the Highest Market**

While Seneca has corrected the errors described above in its Post-Trial Brief, Mr. Beck's testimony was flawed in a number of other more significant respects. Perhaps most egregiously, he indulged an assumption about the value of the timber to be sold in the hypothetical sale that contradicts both Seneca's practice in determining its bid and even his own. Specifically, he assumed that a purchaser for a hypothetical sale in 2016 would have calculated the amount it would bid with the expectation that the entirety of Douglas fir logs harvested from the deleted acres—more than 90% of the total timber volume in the sale—would be sold to specialty cutting mills. See Pl.'s Br. at 20; Tr. vol. 1, 229:12–25.

Seneca's CEO testified, however, that, in 2003, Seneca expected between 25% and 35% of the Trapper logs would be sold to specialty cutting mills. Tr. vol. 1, 94:18–24. The rest, he said, would be processed in Seneca's own facilities. Id. 52:2–10 (testifying that, had Seneca harvested the entire Trapper sale in 2003, it would have processed the majority of the timber in its own mills to make commodity products). Similarly, in its 2015 claim letter, Seneca stated that it "expected to process [6,614 MBF]" of the 8,724 MBF timber in the sale (i.e., approximately 75%) "in its own processing facilities." JX 78 at 12. And when Seneca harvested 1,857 MBF in the modified Trapper sale in 2017, JX 94 at 1, it sold only 392 MBF—barely 20%—to specialty cutting mills, Tr. vol. 1, 117:4–13.

Moreover, Mr. Beck testified that it was his practice to bid on similar sales with the expectation that approximately 25% of the harvest would yield high-grade logs. Id. 203:21–24. And in an earlier report he drafted to support Seneca's original claim for compensatory damages, including lost profits, he acknowledged that 75% of the Trapper sale "would have been processed by Seneca's mills . . . based on what they said they were going to do . . . on this particular case." Id. 261:3–9.

The Court recognizes Mr. Beck's years of experience performing timber appraisals and does not doubt his good faith. But it is not clear to the Court that Mr. Beck understood his task to be projecting what a reasonable bidder would have paid at a sale of comparable timber by the Forest Service. His methodology of appraising to the highest market significantly inflated the value of the uncut timber and does not capture the real-world practices that contractors follow when determining their bids. For these reasons alone, Mr. Beck's opinion regarding the rate that would have been paid for comparable timber, during a hypothetical sale conducted in the six months before May 9, 2016, lacks credibility.

2.    **Reliance on 2018 Purchase Order with Herbert Lumber**

The Court also found unpersuasive Mr. Beck's testimony regarding the price Seneca might expect specialty cutting mills to pay for comparable timber in the period between December 2015 and May 2016. As noted above, he based his opinion on a July 2018 purchase

24

order with Herbert Lumber. Mr. Beck testified that it was reasonable to use that purchase order because the market for higher-and-better-use logs is "pretty stable." Tr. vol. 1, 223:1–3; see also id. 222:15–25 (explaining that this purchase order "was specific to Trapper"); id. 223:3–5 ("I have literally written purchase orders that were in place for five years."). But Mr. Beck's testimony on this point is not supported by objective evidence. In fact, based on the Log Lines index the parties put into evidence, it appears that prices for Douglas fir spiked between 2016 and 2018. See JX 101 at 1.[12]

In addition, the Court found Mr. Beck's testimony about the trajectory of the specialty log market during this period unpersuasive. Mr. Beck testified that prices in the specialty log market between 2003 and 2016, while on an upward trajectory, Tr. vol. 1, 205:23–24, 252:1–12, 252:20, were nonetheless "fairly flat," see, e.g., id. 252:4, 252:12–16, 254:10–13. At the same time, he also testified that the pond value of the ninety-eight deleted acres "increase[d] in value significantly between 2003 and 2016," because of shortages in the supply of high-grade logs. Id. 272:18–273:1.

These two statements seem to contradict each other, and Mr. Beck's demeanor during his testimony appeared to reflect that he was tentative and unsure about the market's trajectory.[13]

Further, in 2003, Seneca estimated the pond value for the entirety of the Trapper sale timber (shown as "total realization," "total value," and "gross value" in Seneca's bid calculation sheet), to be approximately $3.5 million. JX 7 at 1–2. If Mr. Beck is to be believed, then by 2016 the price for just one-third of that timber was some two-thirds higher (or $5.8 million). Similarly,

---

[12] In its Post-Trial Brief, Seneca suggests that as an alternative to the Herbert Lumber purchase order, the Court might instead rely on a 2016 "catch-all" purchase order from another milling operation. Pl.'s Br. at 24–25 (citing JX 82 (2016 Oregon Overseas Timber purchase order)). It argues that using the prices contained in that purchase order would result in a reduced residual value of $2,429,398 and a bid rate of $415.99 per MBF (as compared to the rate of $584/22 per MBF derived from the Herbert Lumber order). Id. At trial, the Court sustained the government's objection to the consideration of this argument because it was not made a part of Mr. Beck's report and because counsel for the government did not become aware of it until the Friday before trial. See Tr. vol. 1, 224:8–17. The Court therefore will not consider the Oregon Overseas purchase order in calculating damages.

[13] Other witnesses also offered conflicting testimony about the nature of the specialty log market. Seneca CEO Todd Payne, for example, testified that "the market for appearance grade specialty products that cutting mills are looking to source" is "much more stable" than that of the commodity logs processed by his own company. Tr. vol. 1, 45:21–46:4. In nearly the same sentence, however, Mr. Payne testified that the market for higher-and-better-use timber has been rising in the past two decades, owing to increased environmental protections and evolving forest management efforts in the Pacific Northwest. Id. 45:20–46:4, 49:19–50:17 (explaining that "the type of wood that [the specialty mills are] able to manufacture from is much less today than it was, say, [twenty] years ago"). In fact, he testified, in light of the price increase in the twenty years since it bid on the original Trapper sale, Seneca would not have been willing to bid on the sale at all had it occurred in 2016 rather than in 2003. Id. 49:19–50:8, 51:7–17.

25

Mr. Beck ultimately calculated a "residual value"—revenue from the sale less costs to harvest it—of nearly $3.8 million for the six-month period before May 2016. Tr. vol. 1, 249:2. That resulted in a margin that is nearly 10 times the roughly $390,000 margin Seneca projected for the entire sale in its bid calculations in 2003. JX 7 at 1. These results seem highly improbable and provide another reason why the Court cannot credit Mr. Beck's analysis.

### 3. Mr. Beck's Difficulty Answering Questions

Based on both his demeanor and the substance of his testimony, the Court's impression was that Mr. Beck did not have a good handle on, among other things, the components of the formula for determining compensation under CT9.52. For example, at trial, government counsel asked Mr. Beck what figure he used as the current contract rate in his analysis. Tr. vol. 1, 233:18–19, 233:23–24. Mr. Beck was unable to give a clear answer. See, e.g., id. 234:22–235:3 ("Q. Well, if I said to you, are you able to tell me, you know, just based on looking at your report, what current contract rate you used for your analysis, would you be able to get to that rate just by looking at your report? A. I wouldn't. The – the rate – the advertised rate only matters now. Never mind.").

Further, Mr. Beck initially testified that his determination of residual value included a deduction for the stumpage payments that a hypothetical purchaser would make to the Forest Service. Id. 248:19–23. When pressed, however, he conceded that his cost estimate did not include those payments. Id. 249:19–23.

Finally, Mr. Beck testified that average logging costs during the relevant time period would have been $289.15 per MBF. Id. 258:16–21. Yet in his initial report, which was prepared to support a claim for breach-of-contract damages, he had estimated costs of $514.86 per MBF in the last six months of 2013. Id. 260:1–14. He was unable to explain this substantial disparity. See id. 260:4–9, 260:12–14 (stating of his own expert report, "I'm not familiar with this—this document"); id. 261:9–20 ("I think that $514 reflects the fact there was a heck of lot more helicopter logging to begin with. I'm not sure. I'd have to spend more time studying it."). Given that increased logging costs would affect the rate a purchaser would be willing to pay for timber, this disparity is a critical one. Mr. Beck's inability to answer questions and seeming lack of preparation at trial further undermines the Court's confidence in his analysis.

### D. Testimony of David Bishop

At trial, the government presented the testimony of David Bishop, the pre-sale forester for the McKenzie River Ranger District. Tr. vol. 2, 328:25–329:1. Mr. Bishop has been employed by the Forest Service since 1975, id. 329:8–9, 329:15–20, and has been stationed at the Willamette National Forest (after previously being stationed there from 1979 to 1986) since 1990, id. 330:7–13. Over the last thirty-plus years, Mr. Bishop has conducted numerous appraisals in connection with timber sales within the Willamette National Forest, id. 330:16–25; see also id. 344:7–14 (testifying that he performs five or six appraisals per year on timber in the Willamette National Forest), including an appraisal of the original Trapper timber sale in 2003, id. 333:3–334:3, 334:8–9, 336:9–11, 344:6–17; see also JX 4 (Forest Service Appraisal of original Trapper sale dated August 24, 2003). At the government's request, and without

objection by Seneca, the Court qualified Mr. Bishop as an expert in Forest Service timber appraisal. Tr. vol. 2, 346:21–347:4.

Mr. Bishop explained that the purpose of the appraisals he performs is to set an "advertised rate" (minimum bid) for timber sales. Id. 333:10–12, 334:15–23, 335:6–8. Pursuant to Forest Service policy, his objective is to set the advertised rate at a level that is between 70% and 85% of the winning bid. Id. 335:12–19.

Mr. Bishop begins his work by attending and supervising a pre-sale timber cruise. Id. 332:10–22, 333:5–9, 351:6–13. The sole purpose of a Forest Service cruise is to determine the volume of the timber, id. 332:23–333:2; the cruise is not intended to determine its grade or quality, id. 351:14–352:2; see also id. 353:24–354:14. The cruise volume is used to appraise the value of the timber. Id. 333:5–12.

As Mr. Bishop described in detail at trial, see id. 336:8–344:5, with the timber volume in hand (and through the appraisal process), id. 334:20–23, he uses Forest Service software to determine the appropriate advertised rate, id. 341:19–22. The data inputs used to appraise timber are updated on a monthly basis. Id. 344:3–5, 365:1–366:24.

Mr. Bishop used the Forest Service software to appraise the original Trapper sale in 2003. Id. 334:10–13, 334:25–335:3, 336:8–11. That appraisal resulted in an advertised rate of $83.52 per CCF. Id. 337:1–9; JX 4 at 1 (Mr. Bishop's 2003 appraisal of the original Trapper sale). Seneca's winning bid was $117.25 per CCF. JX 8. The advertised rate ($83.52 per CCF) was 71.2% of this winning bid, thus meeting the Forest Service's target. See Tr. vol. 2, 362:3–6.

Mr. Bishop used the same methodology to conduct "a hypothetical appraisal of the Trapper Timber Sale as if the original 149-acre sale had been sold on May 9, 2016, rather than [in] 2003." Id. 347:13–16, 347:22–348:1. That effort yielded a hypothetical advertised rate of $52.15 per CCF, id. 350:2–5, which is substantially below the 2003 advertised rate of $83.52 per CCF, id. 350:7–10. Mr. Bishop attributed the difference to significant increases in logging costs from 2003 to 2016. See id. 379:14–25.

Mr. Bishop used the hypothetical advertised rate of $52.15 per CCF to project the winning bid in the hypothetical sale. Id. 348:2–9. He adjusted that advertised rate by the percentage by which the bid premium in Seneca's 2003 Trapper bid exceeded the 2003 advertised rate (i.e., 40.39%).[14] The result—$73.21 per CCF—is what the Forest Service software calculates a hypothetical purchaser would have paid had the Trapper sale been held in 2016. See Def.'s Resp. at 39–40.

Mr. Bishop testified that, since 1990, he has performed four or five timber appraisals per year (and assisted in one or two others annually) in the Willamette National Forest, employing the Forest Service software he described. See Tr. vol. 2, 344:6–17. Mr. Bishop also explained that he typically attends the auctions for sales he has appraised to assess the accuracy of his

---

[14] The "bid premium" is the difference between the advertised rate and the rate at which the timber ultimately is sold. Tr. vol. 2, 335:20–23.

appraisals. Id. 344:18–345:1. He then takes into account the information he has learned in performing future appraisals. Id. 345:2–4. In addition, the Forest Service conducts reviews and issues reports addressing how well each district performs in accomplishing its target of setting minimum bids in timber sales at 70–85% of the winning bid. Id. 345:5–11.

Mr. Bishop was a credible witness and, given his many years of experience conducting Forest Service appraisals, his opinions are entitled to significant weight. In addition, the methodology that he employed—which utilized the software that the Forest Service routinely uses to determine the minimum bid price—was sound. Further, Mr. Bishop's opinion, unlike Mr. Beck's, directly addresses the requirement in CT9.52 that contract rates be compared with "the rates paid for comparable timber on the same National Forest." JX 10 at 111. Mr. Bishop did not attempt to determine the value of the Trapper timber on the open market. See Tr. vol. 2, 355:4–8. His analysis was designed to determine the price at which the timber would have sold had the Forest Service held a sale in the six months before May 9, 2016, the date of the partial termination. See id. 355:6–11, 348:5–9; see also Def.'s Br. at 38–40.

To be sure, the Forest Service's appraisal system is not invariably accurate. But Mr. Beck's statement—that the agency's appraisals "never seem to be right . . . especially in a sale like Trapper"—is not supported by the record. See Tr. vol. 1, 233:25–244:1; see also id. 244:4–15 ("How can you appraise a sale if you're not . . . looking at the quality of the log? . . . how can you make a determination of what the value is? And that's what an appraisal is. It's valuation."). Mr. Beck admitted that he had never studied how frequently the Forest Service's appraisals met their target. Id. 243:19–22. And the fact is that Mr. Bishop used the same methodology for the appraisal of the hypothetical 2016 sale he did for the original Trapper sale in 2003, which, as described above, met the Forest Service's target. Tr. vol. 2, 334:10–13.

Seneca also references five timber sales of "significant volume" on which it bid in 2016 and in which its "bid was a minimum of 1.75 to nearly seven times the advertised bid value." Pl.'s Br. at 25 (citing JX 96). The document in which these sales are reflected was prepared by the government to illustrate, among other things, that the value Mr. Beck ascribed to the Trapper timber was far higher than any of Seneca's bids for timber sales in the Willamette National Forest between 2002 and 2019. See Tr. vol. 2, 363:3–6. It includes a list of more than a hundred sales on which Seneca bid over the course of seventeen years. See JX 96. In many instances, it reflects that the Forest Service met the 70–85% target; in others it did not. Mr. Bishop acknowledged that it was not uncommon for the total bid to dramatically exceed the appraised value. See Tr. vol. 2, 364:4–7. But it is impossible to determine from the document why the Forest Service did not meet its target in particular cases, including for the five sales Seneca has cherry-picked out of the list. And because the Forest Service did in fact meet its target for the original Trapper timber sale in 2003, it seems more likely than not that the appraisal conducted for a hypothetical Trapper timber sale held in 2016 was also accurate.

In short, the Court assigns greater weight to Mr. Bishop's opinion than it does to Mr. Beck's. It concludes that Seneca has failed to show that a reasonable purchaser would have paid a rate for the timber sold in the hypothetical 2016 sale that was higher than the applicable contract rate. Nor did Seneca demonstrate with reasonable certainty how much higher those rates

28

would have been. Therefore, the Court concludes that Seneca is not entitled to an award of damages under CT9.52.

## IV.    Out-of-Pocket Expenses

Under either CT9.51, CT9.52, or CT9.53, Seneca was entitled to secure reimbursement for its out-of-pocket expenses as defined in BT6.02, see JX 10 at 111–12 (CT9.51, CT9.52, and CT9.53), i.e., its "unrecovered costs arising directly from performing the contract as a result of an interruption of operations and occurring prior to contract termination," JX 12 at 30 (BT6.02). In accordance with the COFD concerning Seneca's breach-of-contract claim, see JX 84 at 15, the Forest Service reimbursed Seneca for out-of-pocket expenses in the amount of $141,327.98, Pl.'s Br. at 22. That amount was based on the difference between the original road reconstruction package for the Trapper sale and the modified sale that the Forest Service developed for purposes of attempting to settle Seneca's claim. See JX 80 at 2 (noting the "costs of specified road reconstruction package no longer used"); see also Tr. vol. 1, 146:19–147:4 (discussing JX 80).

At trial, Brian Carlin, Seneca's Senior Vice President and Chief Financial Officer, acknowledged that he "ha[d] no idea" whether or not the $141,327.98 that the Forest Service paid Seneca accurately reflects the expenses Seneca incurred for roads that ultimately were not needed for the modified sale. See Tr. vol. 1, 147:5–8. He acknowledged that Seneca did not conduct an analysis that would have allowed it to make a similar determination. Id. 146:11–18.

Nonetheless, Seneca contends that it is still owed additional reimbursement for road costs (as well as the expenses of engineering services and bond premiums it paid). See Pl.'s Br. at 22; Pl.'s Reply at 4–5. Relying upon entries in Seneca's general ledger, Mr. Carlin testified that Seneca spent a total of $238,257.85 on roads, Tr. vol. 1, 135:8–12, $21,004 for engineering expenses, id. 136:20–25, and $4,397 for bond premiums, id. 137:8–13 (referencing demonstrative exhibit). The total expenses, according to Mr. Carlin, were $263,658.85. Id. 138:17–139:2.

Seneca urges the Court to accept this figure based on Mr. Carlin's testimony and to use a pro rata approach to determine what portion of the total represents unrecovered costs, i.e., expenses incurred which would not have been incurred in harvesting the trees under the modified sale. See Pl.'s Br. at 22. That approach, Seneca argues, results in a determination that Seneca's out-of-pocket expenses total $207,536.14, which leaves a balance owing it of $66,208.16. Id.; see also Tr. vol. 1, 139:7–8.[15]

The Court agrees with the government that Seneca has not established its entitlement to the additional reimbursement it seeks. Provisions CT9.51, CT9.52, and CT9.53 state not only that upon a partial termination the purchaser is entitled to reimbursement for out-of-pocket

---

[15] Seneca reasons that, as a result of the partial termination, it could harvest only 21.28% of the alleged 8,724 MBF of timber available in the original Trapper timber sale (as determined by the Jackson and Prochnau cruise). See Pl.'s Br. at 22. It therefore contends that it is entitled to reimbursement for 78.72% of its total costs ($238,257.85), or $207,536.14.

expenses, but also that the "Purchaser agrees to provide receipts or other documentation to [the] Contracting Officer that clearly identify and verify actual expenditures." JX 10 at 111–12 (stating the same at CT9.51, CT9.52, and CT9.53).

There is nothing in the record demonstrating (and Seneca does not appear to argue) that it provided the CO with receipts or documentation that clearly identified and verified its actual expenditures for any of these items. Further, Seneca has not provided such receipts or documentation to the Court. Instead, it relies entirely upon Mr. Carlin's testimony, which he based on data from Seneca's general ledger. Tr. vol. 1, 139:17–19; see also id. 139:20–140:4 (observing that "the various expenditures . . . associated with the [original] Trapper" sale "go[] back a long way," and so he was "relying on [Seneca's] general ledger system to a great degree," but that he "believe[d]" his summary was "a proper reflection of expenses incurred"). But even then, Seneca did not seek to introduce the ledgers themselves into evidence.[16]

On cross-examination, Mr. Carlin was asked whether any of the expenses Seneca now claims could be verified "by looking at receipts, contracts, purchase orders, canceled checks, [or] documents of that nature." Id. 143:5–9. Mr. Carlin responded that Seneca did have documentation for the road expenditures "in a file . . . at the office" that he had secured from the accounting department and which he had looked at the preceding Friday. Id. 143:10–23. Mr. Carlin did not know whether this documentation was provided to the government. Id. 143:24–144:7. He acknowledged that neither he nor anyone he could name at Seneca had done so. Id. 144:12–145:7; see also id. 147:12–23 (agreeing that he "ha[d] not" provided receipts or other documentation, and that he was "not aware of anyone specifically at Seneca who has").

In any case, if there is supporting documentation for the road expenditures in a file, it was also never introduced into evidence. The Court concludes, therefore, that Seneca has failed to provide adequate substantiation for its claim that it is entitled to additional reimbursement for out-of-pocket expenses.

## CONCLUSION

On the basis of the foregoing, the government is entitled to judgment on Seneca's breach-of-contract claim. Each party shall bear its own costs. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge

---

[16] Mr. Carlin testified by reference to a demonstrative exhibit, Pl.'s Ex. 212, which the Court permitted him to use over the government's objection, see Tr. vol. 1, 141:4–17.